## Cauffman *et al. versus* Long.

1. Where a case is submitted to a jury upon clearly insufficient evidence, such as no court ought to sustain a verdict upon, this court will reverse.

2. It is the duty of the court to determine the sufficiency of evidence of testamentary incapacity, and it is error to submit the question to a jury unless it be sufficient.

3. It is error to submit to the jury matter of which there is no evidence.

May 8th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ. WILLIAMS, J., absent.

ERROR to the Court of Common Pleas of *Perry county:* No. 28. Of May Term 1876.

This was a feigned issue, upon precept from the register, filed in the Common Pleas, directed to try the validity of the will of Henry Cauffman, deceased, presented for probate by Abraham Cauffman and Benjamin Cauffman, executors named therein, against which Mary A. Long filed a *caveat*, alleging—

1. That Henry Cauffman was not competent to make said writing; that he was not in his proper mind.

2. And the same was induced by undue influence and fraud.

The executors were made plaintiffs, to sustain the will, and are plaintiffs in error, and Mary A. Long defendant, contesting the will, and is defendant in error.

The case was tried upon a wager before Junkin, P. J., October 26th 1875.

The will was drawn by Lewis Potter, Esq., a lawyer, specially

[Cauffman *v.* Long.]

sent for, on the 6th of February 1873, in the presence of none other than the testator and himself, and left in the keeping of the testator, who died on the 2d of June 1875, more than two years afterward, at the age of seventy-eight.   Mr. Potter and the testator left the basement where they had taken dinner with the rest of the family, went up stairs to a sitting room, where, at a table provided with writing material, the testator first submitted a will which had been drawn by Rev. John Snyder, and which Mr. Potter advised him to cancel by reason of some informality.   It was cancelled there, and without hesitation the testator dictated, and indicated with pen or pencil, on a skeleton made by Mr. Potter, the dividing lines of the land.

· When drawn and read to him, the testator, on being told that another witness was necessary, rapped upon the floor and told a lady who answered the summons to bring Jones, and at the testator's request Mr. Potter and Jones subscribed as witnesses.

The testator left two sons, the executors, and three daughters, Sarah, unmarried, Mary Long and Eliza Shellenberger, all of whom survived him except Eliza, who left two daughters, mentioned in his will as granddaughters.

By this will he gave to Abraham his stock, consisting of horses and cows, all his farming utensils and all the personal property in the house in which he resided, except what he reserved for Sarah; the old farm he then resided on, except the part where Benjamin resided, and all the improvements belonging to the old farm, and the field east of the improvements; that is, Benjamin should have the first field east of his improvements where he resides, above the road that leads to Liverpool; the tract known as the Turkey Valley tract, and the tract known as the Sypher farm, the balance of the Baker tract, after Benjamin had his portion; the balance of the Long tract, after Benjamin had his portion.

· He gave to Benjamin two fields of the Baker tract south of his house to Shellenberger's line; that portion of the old mansion tract between the Liverpool road and the Strasser road, to extend east as far as the middle fence, and to be a straight line across from the Liverpool to the Strasser road; the tract known as the Tannery tract; that portion of the Baker tract north of the Tannery tract; all that tract of land situate in Liverpool township, purchased from his brother Joseph; excepting the timber of five acres, to be used on the old mansion when needed, a portion of which was to be used on the Sypher tract when needed; a house and lot he owned in the town of Nineva, state of Indiana.

Also, to Benjamin and Abraham his share in a store, including his share in the books in said store.

To his daughter Sarah he gave two good beds and bedsteads, one rocking-chair and two other chairs, and one chest out of his household furniture; directed that she should have her home with his two

[Cauffman *v.* Long.]

sons Abraham and Benjamin on the farms, wherever she chose to stay, and that she should be kept in a decent and respectable manner during her natural life.

He gave to Mary Ann Long, the contestant, $300, to be paid her three years after his decease by his executors.

To his granddaughter Elizabeth E. Shellenberger $300, to be paid four years after his death by his executors.

And the same to Mary Laura Shellenberger, granddaughter, to be paid five years after his decease.

This disposition appears to have comprehended all his property. The testator, Henry Cauffman, had in 1841 taken by devise from his father what was called the mansion farm and the tract in Turkey Valley, valued then at $2660, and the balance of the executor's account of his father's estate, which was $13,000. The value of the real and personal estate that passed by his own will was stated at $60,000, which includes the increased value of the lands he had received by devise and now estimated at $20,000. Of close, careful, saving disposition, unsocial, peculiar by disposition and habit, and in his latter years afflicted with rheumatism, and almost deprived of sight, while his wife lived he referred many matters of business to her, and after her death to his sons Abraham and Benjamin.

These latter remained with him, worked for him and under him until they were both advanced in life, he living in the family of Abraham on the mansion farm. Eliza married when she was at the age of twenty-four, and had died, leaving her husband and the two children Elizabeth and Mary. Mary Long was taken when but ten days old, at the death of her mother, and raised by a Mrs. Long, married Joseph Long at the early age of sixteen, it seems against the will of the testator, had been subjected to a life of ill-treatment, and in the life of the testator had been driven from her home, and forced to hard daily labor.

The question of undue influence and fraud was withdrawn from the consideration of the jury by the court below, for want of any evidence to support the allegation.

That of incapacity was submitted upon evidence in substance as follows :—

Kirk Haines: "I knew Henry Cauffman since 1837, and prior perhaps ; I was in the mercantile business part of this time ; Cauffman dealt with us in his trucking arrangements. He would come to the store with his wife and she would do the bargaining ; he hardly ever interfered. His wife, while she lived, did the business, and after her death, then Benjamin and Abraham Cauffman came in nearly every week with produce. When applied to for what he wanted he would refer to his wife, and he took no part in it. He seemed to be a mere protection to his wife in bringing her in, &c. In latter part of his life I never asked him anything about dealings. This con-

[Cauffman v. Long.]

duct was habitual. From this my opinion is that he was a weak-minded man, but very stubborn, in his opinion, immovable. Yet I know that he was controlled or allowed himself to be controlled. He might have been capable in mind of making a contract, but he would never do it without the advice of his sons Abraham and Benjamin. My opinion is that he could make an advantageous contract, because of his fondness of money ; making and keeping money was his leading star. He was not speculative, but kept all he got.''

Abraham Long: "Henry Cauffman was my uncle. His habit was to stay at home, visited none ; was not once in our house in the last fifteen years ; he was crippled with rheumatism during this time.''

Sheriff Rinehart: "Knew Henry Cauffman ever since I was a boy ; 1860 or 1862 there was a dispute about the control of a church, and during the controversy Shimp, the minister, said this was God's house. Cauffman replied, 'It is not your house nor God Almighty's house. It is my house. I built it.' Shimp announced services in the house, and Cauffman said, 'You better don't or you better won't.' There was some more conversation, and Shimp again announced preaching, and Cauffman again replied in the same way, and added, 'We want one to preach Christ and Him crucified, and not for money, money, all the time, as you do.' I had no intercourse with him then until I was sheriff, in November 1869. In serving the writ, he asked me what it was about, and I told him, and he got a little excited, cross at me, and then I explained that it was my duty. He remarked there was no justice in this. He said there was no use of a man going to court unless he belonged to a secret organization. I never knew him to have any social habits. When I went there he generally asked me to see Abraham. My opinion is that he was a monomaniac, that he was rational on some subjects, and not on others ; that his mind could be influenced, that he would follow a man he had confidence in ; that if he disliked a man he could not be reconciled to him ; that he was a weak-minded man and could be led astray.''

Isaac L. Long: "I went to see my grandfather, met him seated outside on a bench. I asked him if he knew me ; said he did not. Told him I was the son of his daughter Mary ; he made no reply. I told him the condition of my mother, that she was driven from my father's, and had no means of supporting herself except working by the week. He made no reply. Abraham spoke up and said she did not help to earn any of this property, and was not entitled to any of it. The old gentleman called his dog and hissed him on something, and that ended the conversation.''

Abraham Long : "He was sitting on the porch and I bid him the time of day, and he said 'Hunck?' Then I asked him where the women were, and he said 'Was sag't?' I repeated the question in German, and he made some noise in answer to it. He looked up

[Cauffman *v.* Long.]

queerly, jerking himself up. From this I formed the opinion his mind was wavering."

Isaac Wright: "Known him for forty years; about twenty-five years ago I went to buy grain. He named a price; I agreed to give it; said he would let me know in a few days; never got it. Next season went after corn; said his wife was not at home; offered to pay money on it, which he refused; could have it if his wife agreed, and then could pay. Went to him for lime, they were just going to dinner, said I should go with him into his house. Dinner was ready; the family ate, we were left sitting in the same room until they were done, and then he gave the lime. From these facts I think the old man was not sound in mind."

Dr. Jacob Ritter: "Knew him thirty years, saw him frequently, and had special conversations; peculiar in appearance and habits; lacked sociability and confidence in every person. Saw him shortly before his death. He could scarcely discern me, but knew my voice. When I first knew him he was capable of doing business, but during the last few visits in which I conversed with him I am confident his mind and general health had failed. I thought his mind was on the monomania order; I would not like to convey the impression he was insane, nor yet sane, but rather what is intermediate, that is, a partial weakness or derangement on certain subjects."

Judge Watts: "I was well acquainted with Henry Cauffman twenty-five years ago. About one year before his death, after Mrs. Long had been driven from her house, I came on her behalf to see Henry Cauffman, and I tried to prevail on him if there was some possibility of providing for her before he died. He declined, and said that it would be grossly wrong to take from the rest of the heirs and give it to her, that she had earned him nothing. This was the only ground or reason that he gave; did not object to it on any other account. I don't know whether he or the boys said that it was on account of her marrying Long, but I rather think he did not say so, and that it was the boys who said that was the reason. I cannot assail Henry Cauffman's mind; it was good enough to know what he was doing; his was a peculiar disposition. I saw him twice within one and one-half years of his death."

Plaintiffs asked the court below to say that the whole evidence in regard to mental soundness fell far short of that adduced in many cases, in which the testamentary capacity was held to be sufficient by our court of last resort, and the testators' wills sustained, and would not warrant a jury in setting aside the disposition made by this testator of his estate, which positive instruction the court below refused to give. The court below also submitted to the consideration of the jury, as a fact in the case, and as showing testamentary incapacity, that the testator was impressed with the idea that his daughters should remain with him until his death, "to forego the joys of maternity," in order to entitle them to any portion in his

[Cauffman v. Long.]

estate, of which there was no evidence in the case.    This portion of the charge of the court below, excepted to by the plaintiffs in error, is fully quoted in the opinion of this court.

The verdict being for the defendant, plaintiffs took this writ and the foregoing refusal of the court and the portion of the charge above noted were the errors assigned by reason of which the judgment is reversed.

*Lewis Potter* and *Charles A. Barnett*, for plaintiffs in error.— The testimony to show testamentary incapacity was not sufficient: McMasters *v.* Blair, 5 Casey 302; Dickinson *v.* Dickinson, 11 P. F. Smith 401.    There was no evidence of delusion: Graham's Appeal, 11 P. F. Smith 46.    Issue refused for insufficient evidence: De Puy Estate, 1 Weekly Notes 212; Thompson *v.* Kyner, 15 P. F. Smith 380; Stevenson *v.* Stevenson, 9 Casey 469.    Review of the facts on one side may mislead jury: Parker *v.* Donaldson, 6 W. & S. 132; Neiman *v.* Ward, 1 W. & S. 68; Heilbruner & Co. *v.* Wayte, 1 P. F. Smith 259.    It was error to submit to the jury the evidence of delusion, when there is no evidence: Musselman *v.* E. B. & Waynesburg Railroad Co., 2 Weekly Notes 105; Evans *v.* Mengel, 1 Barr 68; Haines *v.* Stouffer, 10 Id. 363; Sartwell *v.* Wilcox, 8 Harris 117.

*Sponsler & Lyons*, for defendant in error.

Mr. Justice PAXSON delivered the opinion of the court, May 29th 1876.

The growing disposition of courts and juries to set aside last wills and testaments, and to substitute in lieu thereof their own notions as to what a testator should do with his property, is not to be encouraged.    No right of the citizen is more valued than the power to dispose of his property by will.    No right is more solemnly assured to him by the law.    Nor does it depend in any sense upon the judicious exercise of it.    It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances testamentary dispositions of property seem harsh, if not unjust, the result, perhaps, of prejudice as to some of the testator's kindred, or undue partiality as to others.    But these are matters about which we have no concern.    The law wisely secures equality of distribution where a man dies intestate.    But the very object of a will is to produce inequality, and to provide for the wants of the testator's family; to protect those who are helpless; to reward those who have been affectionate, and to punish those who have been disobedient.    It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements.    This is due to the imperfections of our human nature.    It must be remembered that in this country a man's prejudices are a part of his liberty.    He has a right to them; he may be unjust to his children or relatives; he is entitled to the control of his pro-

[Cauffman *v.* Long.]

perty while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, but is the uncontrolled act of his own mind, it is not to be set aside in Pennsylvania without sufficient evidence, nor upon any sentimental notions of equality.

In this case the question of fraud and undue influence was withdrawn from the jury by the learned judge of the court below for the reason that there was not sufficient evidence upon this point to submit to them. But he did submit the question of testamentary capacity, and upon this issue the jury found against the will. The verdict does not surprise us, in view of the provisions of the will itself, and of the manner in which the case was tried. Henry Cauffman was an old man, with strong peculiarities, living with his sons ; to a great extent secluded from the world; a seclusion enforced by rheumatism for several of the last years of his life; reticent and unsocial in his habits. Two of his sons remained at home working for their father until his death, at which time they had respectively reached the ages of forty-seven and fifty-five. They had evidently aided him materially in the accumulation of his fortune. His daughters left home when comparatively young, and one of them at least appears to have married without his consent. It is also probable he inherited the disposition so prevalent in the last century, of favoring the sons at the expense of the daughters. In any event he does not seem to have had much affection for the latter or their children, and practically disinherited them. Under these circumstances it is not surprising that the jury found against the will upon the question of testamentary capacity, especially in view of that portion of the charge of the learned judge embraced in the tenth specification of error. In referring to the testator's prejudice against Mrs. Long, one of his daughters, and the defendant in the feigned issue, he said : " If it arose from the belief in his mind that she should have remained with him and worked year by year (she is now fifty years old), until he was dead, and if she did not, she was entitled to nothing, or but little, this would be such an unreasonable expectation that it excites grave apprehensions for the soundness of the intellect, exacting such devotion as the title to an inheritance, and few would ever receive upon such conditions." * * * " It is very certain that such expectations would rarely be fulfilled; it would require daughters to dwell with and work for a parent from marriageable womanhood to a period when ' The custom of women' is no longer upon them, violating the primordial law of their being, the love of offspring, to the sex an aspiration so fervent and universal, that from Eve to Rachel the cry never ceased, and is to-day so strong upon her, that she steps fearlessly into the jaws of death, impelled by the joys of maternity.

[Cauffman *v.* Long.]

She is so constituted that she leaves father and mother that she may cling to a husband, and no threat, nor promise, nor law, nor decree, nor reward, nor powers, nor principalities, nor angels, nor life, nor death, nor things present, nor things to come, nor height, nor depth will ever change her; for God has made her so—male and female created He them." Just what effect this rhetoric would have upon the average juryman is perhaps difficult to determine. It would depend to some extent upon his intelligence. But as the verdict of this jury was not only against the weight of the evidence, but without any sufficient evidence of testamentary incapacity, we may safely assume that the language quoted materially aided in producing this result. Our objection is not to its style—that is a matter of taste—but to its substance. There was not a word of evidence in the cause to show that the testator thought his daughter should forego the "joys of maternity," and remain and work for him until his death, as a condition of her sharing his estate. He did say to Judge Watts, who called upon him to intercede for Mrs. Long, that "it would be grossly wrong to take from the rest of the heirs and give it to her; that she had earned him nothing." But this did not justify the learned judge in submitting to the jury that which was not in evidence, and which could hardly fail to inflame their minds and excite their prejudices. This belongs to a class of cases in which the court should hold the jury to the evidence with stern impartiality.

There was serious error in submitting the question of testamentary capacity to the jury at all. The learned judge should have withdrawn it altogether. At most there was but a scintilla of proof. The evidence of the defendant upon this point amounts to nothing. One witness, Kirk Haines, swears that he thought the testator was a weak-minded man, because when he came to the store with his wife, he allowed the latter to do the bargaining and never interfered. Sheriff Rinehart thought he was a monomaniac, because he told his pastor, with whom he appeared to have had some difficulty, that "We want one to preach Christ and Him crucified, and not for money, money, all the time, as you do." Also, that at a church meeting there was a dispute about the control of the church property. During the controversy Shimp, the minister, said, "This was God's house." Cauffman replied, "It is not your house, nor God Almighty's house. It is my house. I built it." This was not perhaps exactly orthodox, but when it is remembered that the testator, as was alleged, gave the lot and materially aided in building the church, it hardly shows testamentary incapacity. Upon another occasion, he expressed to the witness, Rinehart, his aversion to going to law, and thought he could not get justice. Abraham Long, another witness, says he thought his mind was wavering from the fact that when the witness made some remark about the time of day he merely said "Hunck?" and that when he asked him where the women were,

[*Cauffman v. Long.*]

he said " Was sag't ?" and looked queerly. Isaac Wright thought he was not sound in his mind because he would not decide upon selling the witness his crop of grain. These are all the witnesses upon this point whose testimony is worth noting. I have not, of course, given all they said. What I have quoted is a fair specimen. We look in vain through the evidence for anything like insanity or delusion.

A court has a higher duty to perform than merely to answer points of law. It is its duty to see that the law is faithfully administered. Such administration requires that a man's will, the most solemn instrument he can execute, shall not be set aside without any sufficient evidence to impeach it. There is no redress here for an erroneous or improper verdict. But where a case is submitted to a jury upon clearly insufficient evidence, such as no court ought to sustain a verdict upon, it is our plain duty to reverse: Sartwell *v.* Wilcox, 8 Harris 117 ; Lower *v.* Clement, 1 Casey 63 ; Silveus's Ex'rs *v.* Porter, 24 P. F. Smith 448.

Judgment reversed, and a *venire facias de novo* awarded.