## Canfield v. Barnes, Appellant.

*Wills—Issue devisavit vel non—Undue influence—Evidence —Insufficient evidence to sustain verdict.*

A verdict against a will in an issue devisavit vel non where undue influence is alleged, will be set aside, where the evidence shows that the testator, a man sixty three years old when he died, made his will in favor of his second wife more than a year before his death and six years after his second marriage; that the will was executed in testator's own privacy, and remained in his exclusive control to within a few days of his death; that testator was a man of unusual intelligence and superior judgment; that although he drank liquor as a habit, he was not under its influence when his will was made nor had it weakened his will power; that he lived happily with his second wife who had contributed to his comfort and happiness; that the wife had not attempted to influence her husband against his children by his first wife; and that evidence of a meretricious relation between the testator and the second wife during his first wife's lifetime was admitted, and given an undue weight by the trial judge in his charge to the jury.

Argued Oct. 23, 1911. Appeal, No. 163, Oct. T., 1911, by defendants from judgment of C. P. No. 4, Allegheny Co., First Term, 1911, No. 86, on verdict for plaintiffs in case of Laura E. Canfield et al. v. Emma J. Barnes

et al.   Before FELL, C. J., MESTREZAT, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ.   Reversed.

Issue devisavit vel non to determine the validity of the will of Elmore A. Barnes who died on January 17, 1909, a resident of the city of Pittsburgh. Before CARNAHAN, J.

The contestants claimed that the will was the result of undue influence exercised upon the testator by his second wife, Emma J. Barnes.

The facts are stated in the opinion of the Supreme Court.

Verdict and judgment for plaintiffs. Defendants appealed.

*Error assigned*, amongst others, was in refusing binding instructions for defendants.

*John C. Bane*, for appellants.—The evidence was insufficient to submit to the jury: Roberts v. Clemens, 202 Pa. 198; Caughey v. Bridenbaugh, 208 Pa. 414; Brink v. Brady, 224 Pa. 116; Cauffman v. Long, 82 Pa. 72; Englert v. Englert, 198 Pa. 326; McNitt's Est. 229 Pa. 71; Slater v. Slater, 209 Pa. 194; Tyson's Estate, 223 Pa. 596; Chidester's Estate, 227 Pa. 560; Lewis's Est. 210 Pa. 599; Allshouse v. Kelly, 219 Pa. 652; Snyder v. Erwin, 229 Pa. 644; Levis' Est., 140 Pa. 179; South Side Trust Co. v. McGrew, 219 Pa. 606; Logan's Est., 195 Pa. 282; Grubbs v. McDonald, 91 Pa. 236.

*R. T. M. McCready*, with him *J. M. Stoner*, for appellees, cited: Lewis' Est., 210 Pa. 599; Miller's Est., 179 Pa. 645.

OPINION BY MR. JUSTICE STEWART, February 5, 1912:
This was an issue devisavit vel non, in which the ground of contest was alleged undue influence. The only possible explanation of the verdict condemning

the will in question, is to be found in the great mass of irrelevant testimony that the jury were called upon to consider, the effect of which must have been, if not to divert their minds from the one issue they were trying, to at least influence them in resolving it by considerations improperly introduced into the case. For we do not hesitate to say, after a careful review of every one of the eleven hundred pages of testimony, that there is absolutely nothing in this record upon which this verdict can be justified. The issue was granted at the instance of the testator's children by a first wife who are aggrieved at the disposition made by testator of his estate. The testator was sixty three years of age when he died. This will in question was made more than a year before his death; the codicil attached, some four months before. The will had been prepared by counsel from memoranda submitted by the testator, and was afterwards executed by the testator in his business office, and attested by his own chosen witnesses; the codicil, by which certain changes were made in the will, affecting only one of the appellees, was prepared by the clerk of the counsel who had written the will, and was executed in like manner as the will. Outward constraint in the preparation and execution of the will or codicil there was none, and none is pretended. Both were executed in the freedom of testator's own privacy, and both remained in his exclusive control and custody to within a few days of his death. The testamentary capacity of this man, acting free from control, is admitted; but even without the admission, it is made apparent by the testimony that he was a person of unusual intelligence and superior business judgment. The learned trial judge in his charge has this to say of him: "I think we all agree that at one time in the life of Mr. Barnes, if not at all times, he was a bright, intelligent, strong, vigorous man mentally and physically." The qualification here made is in view of one of the contentions on the part of the plaintiffs, that is,

that through excessive drink in his later years the testator's will had become enfeebled, and his power of resisting importunity correspondingly lessened. This inquiry was pursued at great length, unnecessary ground being covered because the main purpose of the inquiry was lost from sight. The question whether he was a man of intemperate habits was given undue prominence. It not being alleged that at the time of the execution of the will he was under the influence of drink, the testimony with respect to his habit of drink was admissible only as it went to show, as a result of the alleged habit, that he had so far deteriorated in mental force that it was in the power of designing persons to make him adopt their will as his own. Many witnesses were called who testified to having seen him at different times under the influence of liquor. Some testified to prolonged spells of intoxication; some to a constant habit of drink; none, however, that the habit, however constant and long continued, had disqualified him from attending to his business affairs, giving them careful consideration and exercising in connection therewith his usual intelligent judgment. More than this, not one of them testified to a single circumstance which could be made the basis of even a conjecture that his power of self-assertion, which admittedly all his life long had been a prominent characteristic, had in the slightest degree abated. Not a single act of yielding to attempted persuasion of others, of subordinating his views to those of others, or of imprudence in the management of his estate was shown. Out of this mass of testimony on this branch of the case, nothing making for the contention of the plaintiffs can be derived except the academic statement of a physician, who at one time had attended testator in a brief illness, to the effect that a victim of chronic alcoholism has, generally speaking, "less will power, generally a lack of responsibility, sense of responsibility, is more or less lost or carried away by alcohol." A fuller reference to this

feature of the case is unnecessary in view of what we have to say with respect to the main question at issue— the alleged undue influence.

The proponent of the will was the widow to whom testator had given in her own right by far the greater part of his estate. The inequality created by the will is apparent, the discrimination being against these plaintiffs, children of testator's first wife, and the only children testator left surviving. The inequality extends as well to the shares given the children, some are given more than others. It is the contention of the plaintiffs that the will in question was procured by undue influence exercised upon testator's mind by the proponent and her sister, who resided in testator's family and to whom he had given a legacy of $1,000. The intervention of no other party is even suggested, so we have to consider the conduct of these two alone. First, let us observe what affirmatively appears in the evidence. The testator, in what may justly be regarded as unseemly haste following upon the death of his first wife, married the proponent. This, together with the fact that proponent occupied a humbler station in life, having previously been an employee in the laundry owned and operated by the testator, gave offense to the plaintiffs, and resulted in estrangement between them and their father, which continued more or less marked until testator's death, except in the case of one of the daughters, Mrs. McCardell. None of the children resided with their father at the time of this second marriage, each having a home of his or her own. That this second marriage, apart from the estrangement of his children, contributed to the comfort and happiness in a marked degree of the testator abundantly appears, not only by his own frequent declarations to this effect, but by his attachment to his re-established home and his domestic life therein. That he entertained for this wife a most affectionate regard cannot be questioned. Neither can it be questioned that she made him a kind

and considerate wife. During the seven years that this marital relation continued, the peace of it was never disturbed. All the evidence on the subject indicates that the parties were living in mutual confidence and affection, which continued to the end. So much for what affirmatively appears. If now we turn to the evidence introduced by the plaintiffs for the purpose of showing undue influence exerted by the defendants, not only does the utter barrenness of it become apparent, but the conclusion becomes irresistible that the condemnation of this will by the jury was the product of prejudice aroused by wholly irrelevant testimony affecting the character of the proponent, not during the continuance of the marital relation with the testator but preceding it. Before further reference to this evidence, let us say that not a single act of interference of either defendant in connection with the making of the will was shown. Not only was no importunity or entreaty to prefer the widow shown, but it does not appear that even a request on part of either of defendants that testator should make a will was ever made. Further still, the will was made a year before testator's death, and it does not appear that proponent knew of its existence, certainly not of its contents, until shortly before testator's death. Whether she knew it then was a matter in dispute. The record will be searched in vain for any evidence which would warrant an inference that proponent had ever attempted to prejudice testator against his children that is at all credible. A declaration alleged to have been made at a family dinner at the home of Mrs. McCardell by Miss Younkin, one of the defendants, in presence of all the guests, including the testator, to the effect that testator's children ought not to receive any part of his estate, and assented to by the proponent, is the nearest approach to direct evidence on this point. Apart from the fact that it was denied by both defendants that any such conversation occurred, it passes belief that if de-

fendants were actually conniving to influence the testator to make a will discriminating against his children that they were openly avowing their sentiments in the presence of those to be prejudiced thereby, and particularly when it is manifest that such conduct could in no conceivable way further their designs. Conceding that the conversation occurred as related by the witness, it is, if not the only evidence, certainly the nearest approach to substantial evidence on which the theory of undue influence arises. How ineffectual it was, if intended to influence the testator's mind, appears from the testimony of this same witness who says that her father told her as many as fifty times after his marriage to the proponent, and repeated it as late as August, 1908, that he would do with his estate as he pleased, and that no one should know the contents of his will until it was opened. Not a single remark reflecting upon any of these children in a way calculated to prejudice them in the estimation of the testator, notwithstanding their refusal to recognize her as their father's wife, is traced to the proponent. With this exhibit of the evidence, the inquiry is natural—upon what was the case made to turn in the court below? As we read the charge the jury were called upon to consider and pass upon three questions of fact. One of these we have already considered, the extent to which testator was addicted to drink, about which there was much conflicting testimony, but which, upon the plaintiff's own showing, was wholly inadequate for the purpose for which it was offered. The next was whether the proponent had knowledge of the existence of the will and its contents before testator's death, a question of no consequence whatever in connection with the main issue except as associated with other evidence from which undue influence could be derived. In itself, such fact could establish nothing here in issue, but nevertheless it was made one of the vital issues in the case, the jury being told that "it went to the root of the

question itself." The instructions in regard to this unrelated matter covers more than five pages of the judge's charge. The proponent had testified that the first knowledge she had of the existence of a will was derived about two weeks before she and her husband left their home to go to the sanitorium where the latter died. This was in December, 1908. She testified that testator then told her that he had made a will, and that it was safe in the house. She further testified that she did not see the will until her return home after testator's death. Evidence was introduced to show acts and statements made by the proponent inconsistent with her testimony with respect to these matters. One witness testified that during testator's last illness proponent on her return from a visit to her home, upon entering her husband's sick room, produced a paper from a business envelope, threw it on testator's bed and said to him, "I brought your will," and the testator replied, "Put it in the trunk;" that later when one of the daughters came to visit testator, proponent took the will from the trunk and remarked that nobody should see it. Another witness testified that a day or so following testator's death, in reply to a question, proponent said that she did not know whether there was a will or not. All of this testimony was flatly contradicted by proponent. Had ground here been laid for any inference of undue influence on the part of the proponent, the relevancy of this inquiry could be well understood; but without evidence in the remotest degree involving the proponent, it is impossible to see how the determination of the question of proponent's truthfulness with respect to the matter inquired of could in any way affect the issue being tried. And yet the view taken by the court is thus expressed in his instructions to the jury: "But if you find that she is not stating the truth as to her knowledge of the contents of the will, that is a much more serious matter, and one that ought to influence you in rendering your verdict."

The remaining question to which the jury's attention was directed was one not only without relevancy, but one well calculated to divert the minds of the jury from the true and only issue. Our only reason for referring to it—and the same consideration has governed in the discussion of the other questions,—is that some explanation may appear for what we are compelled to regard as an unwarranted verdict. We have referred to the unseemly haste with which the testator, following the death of his first wife, hastened into married relations with the proponent. Had the evidence touching the relations of the parties stopped with this one circumstance, while its pertinency is not apparent, its admission might still have been justified, but it went far beyond, and because it exceeded all reasonable limits, it should not have been admitted. The purpose of the added evidence was to show that before his marriage with the proponent, and during the lifetime of his first wife, and during the lifetime of proponent's first husband, the testator had maintained meretricious relations with the proponent. We shall not attempt a review or recital of the evidence which was relied on to establish this contention. It is sufficient to remark that it was wholly circumstantial, and against it the proponent could do nothing but enter her sworn denial. Whether the charge be true or false, what had it to do with the issue being tried? Seven years before his death the testator had married this woman; during all that time he not only acknowledged her as his wife, but gave unmistakable evidence of his confidence in her faithfulness and his affectionate regard for her, while she in turn, so far as the evidence shows, merited by her conduct his kindest consideration. To permit an inquiry into what occurred between these parties, at a period antedating the marriage into which both voluntarily and deliberately entered, and which, so long as it continued, was marked by mutual regard and affection, under pretext of showing that one exercised undue influence over the

other in the making of a will seven years thereafter, is to disregard the plainest rules of evidence, and allow widest opportunity for prejudice to overcome judgment and reason in the determination of such issues. If the facts were as alleged by the plaintiffs, the moral guilt incurred brought its own condemnation upon the parties with its own appropriate penalty; and violated law, had it been appealed to, stood ready to pronounce its condemnation with its appropriate penalty; but neither in morals nor law can warrant be found for penalizing such misdoing by denying to the parties years after they have entered into lawful marital relations the right to say who shall succeed upon their death to the assets they leave behind. Such right is denied to those lacking mental capacity, and those deprived of freedom of action, but disregard of moral standards at a time seven years removed from the testamentary act, is no test of either condition. In referring to this evidence the court in its charge said: "It is contended on part of plaintiffs, who were children of Mrs. Barnes the first wife, that the relations of Mr. Barnes and the defendant were, prior to the death of the first Mrs. Barnes, illicit and meretricious. This is denied by Mrs. Barnes. Whether the allegation be a fact or not, it does not determine this case. It is an element to be considered in the case with all the other evidence in the case," etc. It is impossible to escape the conclusion that in the submission of this question to the jury is to be found the true explanation of the verdict condemning the will. But our decision of the case rests, not on the views here expressed with respect to the manner of its submission, but on the broader ground that there was nothing in the case calling for submission, and that binding instructions for the defendants should have been given. "A court has a higher duty to perform than merely to answer points of law! It is its duty to see that the law is faithfully administered. Such administration requires that a man's will, the most solemn in-

strument he can execute, shall not be set aside without any sufficient evidence to impeach it. There is no redress here for an erroneous or improper verdict. But where a case is submitted to a jury, upon clearly insufficient evidence, such as no court ought to sustain a verdict upon, it is our plain duty to reverse." This was said by this court in Cauffman v. Long, 82 Pa. 72. It is quite as appropriate here. The first assignment of error is the refusal of the court to so instruct in accordance with defendant's first point. This assignment is sustained; the judgment is reversed, and the issue directed to be set aside; costs to be paid by appellees.