## Boone's Estate.

*Wills—Probate—Issue devisavit vel non—Undue influence—Evidence.*

1. The Orphans' Court will not grant an issue *devisavit vel non*, where, under all the evidence presented, the court could not sustain a verdict against the will.

2. An issue *devisavit vel non* on the ground of undue influence will be refused, when the most that can be found from the testimony is that there was an opportunity for the exercise of undue influence.

3. An issue *devisavit vel non* will be refused where it appears that testator left his estate to a son and stepdaughter who had lived with him for many years, taken care of him and given him their earnings, and the testimony of the scrivener shows that testator had not given instructions for his will or signed it in the presence of the beneficiaries, and other testimony shows that he had declared that the will was in accordance with his wishes, and the only evidence against the will was that of interested relatives.

Citation for an issue *devisavit vel non*. O. C. Columbia Co., Sept. T., 1923, No. 1.

*E. J. Mullen* and *W. S. Sharpless*, for appellants.

*R. S. Hemingway* and *R. O. Brockway*, for appellees.

POTTER, P. J., 17th judicial district, specially presiding, Sept. 2, 1924.— Albert Boone died on July 20, 1923, at the age of about sixty-three years, leaving his last will and testament, dated Oct. 12, 1922. On July 23rd, R. E. Boone and Harman Boone, two of the sons of the decedent, filed with the register of wills a *caveat*, protesting against the probate of the said will of the decedent. No bond was filed with this *caveat*, and on Aug. 3, 1923, the *caveat* was dismissed by the register as having been abandoned, the will was admitted to probate and letters testamentary were in due form of law granted to John L. Boone, the executor named in the will.

On Aug. 10, 1923, an appeal was taken by the said R. E. Boone and Harman Boone from the action of the register in admitting to probate the will of the said decedent and the granting of letters testamentary thereon to the Orphans' Court, and a bond in the sum of $500 was filed, which was approved by the register. On Sept. 17, 1923, a petition was filed in the Orphans' Court by the said R. E. Boone and Harman Boone, praying for the issuance of a citation upon Florence Hosler and John L. Boone, the legatees, and John L. Boone, executor, commanding them to appear before this court on a day to be fixed, to answer the petition and to show cause why the appeal shall not be sustained, the decision of the register be set aside and an issue *devisavit vel non* should not be awarded, directed to the Court of Common Pleas, to determine the following questions:

1. Whether the said paper writing dated Oct. 12, 1922, was knowingly executed by the said Albert Boone as and for his last will and testament.

2. Whether the said Albert Boone was, at the time of the alleged execution of said instrument, of sound, disposing mind, memory and understanding, and of sufficient legal capacity to make a valid will and testament.

3. Whether the said Albert Boone was induced to make said paper writing by undue influence of the said Florence Hosler and John L. Boone.

4. And why said probate should not be set aside and the letters testamentary granted to John L. Boone, as executor thereof, be revoked.

On the same day, to wit, Sept. 17, 1923, the citation was duly awarded. On Jan. 4, 1924, an answer was filed. Voluminous testimony was taken at three separate hearings, the case was submitted to the court by arguments and by briefs, and now we have this case before us for disposal.

Boone's Estate.

In his earlier days the decedent was a boatman, and when this occupation ceased, he became a farmer, first purchasing a small tract of about twenty-five acres of land. By the earnings of himself and his children, which were paid to him, he saved money enough to, from time to time, purchase other real estate, and at the time of his death his farm contained about seventy-three acres, and he owned five or six town properties in Lime Ridge, Centre Township, worth a considerable sum of money.

He was married twice, having children with both of his wives. His second wife was the mother of Florence Elizabeth Hosler, sometimes in the testimony called Florence Hosler, and at times referred to as Florey. When her mother married the decedent she was ten years old, and came with her mother to reside with the decedent, where she has continued to reside up to the time of his death, she being now forty-seven years old. Her mother, the second wife of the decedent, died about eight years ago. From the time her mother died on up to the death of the decedent on July 20, 1923, she has been doing the household work and doing and performing the household duties of the woman of the home. She has always been regarded by the decedent as a member of his household and as his daughter, as well as by his sons, and she regarded him as her father and his sons as her brothers. In her earlier days she earned money by working out, by receiving cash premiums for exhibits at the county fairs, and by raising and selling chickens, all of which she gave to Albert Boone, her stepfather and the decedent. He provided her with a home, clothing and small incidentals.

For some five or six years before his death this decedent was afflicted with diabetes, at times in a mild form and at other times more acutely. He worked and assisted with the general farm work up to June 18, 1922, when he suffered a stroke of paralysis, partially paralyzing his right side, the motive nerves being affected, but not the sensory ones. From that time he was rendered practically helpless, had to have assistance in dressing himself, in going to bed, in arising from bed, in walking and getting about, in cutting his victuals, and, in fact, an attendant was of the utmost necessity to him. The uncontradicted testimony shows that Florence Hosler attended on him and constantly waited upon him up to the time of his death, assisted at times by John L. Boone, a son. Five or six weeks before his death the decedent contracted grippe, and these three afflictions, from which he was suffering, resulted in his death.

John L. Boone, a son, remained at home on the farm with his father, quit school when he was fourteen years of age, did the main part of the farming, cared for the interests of his father, and gave him the care and attention necessary for his comfort. He is thirty-five years of age and unmarried. He also gave his earnings to his father ever since he was able to earn money, and received no compensation for his work on the farm, except a home, clothing and small incidentals.

R. E. Boone, or Rush, as he is frequently referred to in the testimony, also a son of this decedent, is about thirty-seven years of age, has been married for some time, resides in Scranton, and is engaged in the sale of typewriters. He attended the Bloomsburg State Normal School and graduated from that institution, he working his way through partly, his father making up the balance required for his education. For some years he has not been home with his father. He is one of the contestants of his father's will.

Harman Boone, another son, is lacking in intellect very much, is said to be about forty-four years old, although he does not know his age, is married,

although he does not know when he was married. He began to do for himself when he was about twenty years of age, and has been home very little since that time. He is employed as a laborer at the American Car and Foundry Company at Bloomsburg, and has a mind of a normal child of probably twelve years of age.

Two other children were born to Albert Boone, both of whom died some years ago, leaving no heirs.

The care of the decedent during his physical afflictions fell entirely on Florence Hosler and John L. Boone, the other two children being away from the parental home, caring for their business affairs and their own firesides.

On Oct. 11, 1922, this decedent had M. C. Carey, a reputable justice of the peace from Berwick, Columbia County, come to his home. In the presence of a young man named Eshleman, Mr. Carey's clerk, he told Carey that he wanted to, in his lifetime, convey his real estate to John L. Boone and to Florence Hosler, and that he wanted to make his will. He gave Squire Carey all instructions about making the deeds to John L. Boone and to Florence Hosler for his real estate, and at the same time he gave him an oral outline of what his will was to contain, Carey making a memorandum of the disposition of the real estate and taking notes of the legacies and bequests to be contained in his will.

In pursuance of these instructions, Carey prepared the deeds for the real estate to John L. Boone and to Florence Hosler, and he drew a will in accordance with the notes taken. On Oct. 12, 1922, the day following, Carey and Eshleman again came to the home of the decedent with the deeds and the will prepared. All the deeds and the will were read over to the decedent and he expressed himself as being satisfied with them. He signed all the deeds and the will, thus conveying his real estate to John L. Boone and to Florence Hosler, and he signed the will bequeathing $2500 to Forence Hosler and the balance of his money to John L. Boone, whom he named as his executor. He left nothing to his other two sons. They were dissatisfied, hence this appeal from the register's decision in admitting the will to probate and the granting of letters testamentary to John L. Boone. We might add that this will is recorded in Will Book No. 14, page 277, in the proper office at Bloomsburg, Columbia County.

We also think it proper, in this connection, to say that this was the fourth will made by this decedent. In the first one, made some years ago, he conveyed his property to his wife, who was then living, and after her death to John L. Boone and Florence Hosler. The second will was practically the same as the first, with the exception that he had more land to dispose of than in the first, the second one being made thirteen years after the first one. The third will he made about six years ago, wherein he devised and bequeathed all his property to John L. Boone and to Florence Hosler, and the fourth will we have before us, its contents having been already herein set out.

It is a very notable fact that has come to our attention that the four wills all manifest an express intention to make John L. Boone and Florence Hosler the recipients of his bounty. In none of the four wills do we find anything about extending his bounty to either of the other two sons; but it will be noted that there is an express and continuing intention on the part of the decedent to provide for Florence Hosler and John L. Boone, and it will also be noted that three of these wills were made when the testator was sound physically and in good health, before paralysis had overtaken him, after which it is claimed by the contestants that his mind was not clear and that he was not of disposing mind and memory, when it is claimed principally

that in his alleged weakened mental condition undue influence was exercised over him by John L. Boone and Florence Hosler in the execution of the deeds to his real estate and in the making of his will.

Up to the time of his partial paralysis on June 18, 1922, no one disputes his testamentary capacity. And this brings us up to a consideration of the four questions at issue now.

As to the first contention, we must say that, under all the evidence presented on the hearings in this case, the paper writing admitted to probate was executed by Albert Boone as and for his will, and that it was drawn and prepared according to his instructions and desires.

We have the fact that three previous wills provided for his property to go to John and Florence, as witnesses have testified he said, because they had stayed home and cared for him, especially in his helpless condition. On page 247 of the testimony, M. C. Carey, a disinterested person, says he told him his will was as he wanted it. And on page 249 he told the same person that he wanted to pay them, John and Florence, for the care they had taken of him and the work they had done for him; that John had always stayed home and practically received no wages. Squire Carey says, when he told him this, he was mentally sound. On page 260 he said to George Durling that he had given his property to John and Florence because they had earned it; and on page 263 he said he had very good care and he had provided for John and Florence. On page 267 he said he wanted the property transferred to John and Florence, that it was due to them, this being said to Myron Shuman. On page 276 he said to Hanley Hess that John was to have the farm utensils and the farm, and Florence the money in bank and the properties in Lime Ridge. On page 284 he told Mrs. Jessie Huttenstine that John had earned it, and we could not get along without Florence; that she had lived there since she was ten years old. On page 298 he told John Cryder that he was giving his property to John and Florence because they had stayed home and took care of him.

We have other statements in the testimony, not herein cited, tending to show that John and Florence were to be the recipients of his property, and it will be noted that this testimony is given by persons not at all interested in the distribution of this estate. We might add one more statement made to Dr. Wolfe, his physician, found on page 380, that he had disposed of his earthly goods and felt relieved, this being on Oct. 16, 1922, just four days after his will was made; that he had left it to John and Florence because they had stuck to him; that they were the ones who earned it and the ones who should have it. Dr. Wolfe also says he never told him he wanted to change his will.

On the other hand, we have the testimony of Mr. Stewart, on page 67, where the decedent said he could not do as he would like to. On page 84, Mrs. Millington says he told her that John and Florence have the bulk, that they planned this.

Mrs. Millington is a sister to the decedent, and her testimony, at best, is very confusing, and it is hard to determine just what she does want to say. Then, on page 129, Fred Millington, her husband, says the decedent told him that this was not the way he wanted things, and on page 130 he asked if his will could be broken. On page 135 he said that Rush could fight for himself, but on page 183 he said his will was as he wanted it.

It will be noted that in all these extracts of testimony against the will, except one, they come from near relations of the decedent, who might hope to

profit in some way, at some time, by setting the will aside. The testimony for the will is all given by strangers, who have, and can have, no interest in the outcome. As to the first contention, we can say that, at the argument, counsel for the appellants practically abandoned it. Therefore, we must find that the paper writing admitted to probate was executed by Albert Boone as and for his will.

As to the second contention, in view of what has already been herein said, we have no difficulty whatever in saying that Albert Boone, at the time of the execution of the said will, was of sound, disposing mind, memory and understanding.

On page 380 we have the testimony of Dr. Wolfe, his attending physician during his ailments, who says that his mind at the time of the making of the will was clear. We have other disinterested witnesses who say the same, and that he attended to business affairs, that he fixed the rental of his houses, that he arranged for the sale of his personal property, that he agreed to bail on the sale notes, fixed the terms of the lease of his farm, and talked generally on the topics of the day and could hold an intelligent conversation on current events.

As to the third contention, we do not think any undue influence was exercised over him by any one at the time of the making of his will or before that time. This seems to be the contention most strongly relied upon by the appellants.

It is true that Florence and John waited upon the decedent and nursed him in his sickness, but who else would have done it? The other two sons were away from home, had homes of their own to maintain, and these two were at home with the decedent, where they had been practically all their lives. We have the testimony of the Millingtons to the effect that the decedent's will was not as he wanted it, that he wanted to build a house for Harman, his son, but before his disability he never took steps to do so. Then we have the testimony of his brother, W. W. Boone, that his will was not as he wanted it, and that John and Florence had planned it. But we have no steps taken by him to change his will. The time, as testified to, when attorney Sharpless was sent for, the Millingtons arranged for him to come, and it is testified that Albert Boone did not send for him. In fact, all the testimony offered to show his mental incapacity or undue influence was presented and sworn to by relatives of the decedent, while all the testimony offered to rebut this was by persons who were not his relatives, and who could not have interest, direct or indirect, in his estate. Florence Hosler was a member of his family for thirty-seven years, waited on the decedent in his infirmities, and for the past eight years took the place of the woman of the household. John L. Boone is the only son who remained at home with his father and cared for his interests. Both gave him their earnings and assisted him in getting together the property he had. What more natural than that this father's beneficence should go to these two, who had rendered to him the best of their life's years? What more natural than that this father should desire his bounty to go to those who were not situated in life? And as he did bequeath to them his money and deeded to them his real estate, who can say they exercised any undue influence over him, simply because they had the opportunity so to do?

Every man has the right to dispose of his worldly effects as he may see fit. He may distribute them as to him may seem just and proper. We are led to believe that Albert Boone, in the light of his own mind and understanding, did this.

Under all the evidence presented in this case, we cannot sustain a verdict against the will of the decedent, and that is the measure we must use in determining this question.

To sustain the charge of undue influence in the making of a will, the contestants must show that the testator's mind was under such control at the time and in the very act of making his will: Goss's Estate, 274 Pa. 278.

At the time of giving Mr. Carey the text of his will, no one was in the room but Carey, Eshleman and the decedent. How, then, can it be said that any undue influence was exercised on the decedent in the very act of making his will? Squire Carey says he saw no indications of any undue influence whatever.

When the contestants' evidence, looked at separately, would support a verdict against the will, and the proponent's evidence, viewed in the same way, would command a contrary verdict, the issues involved should be submitted to the jury, unless the court is convinced that the proofs on one side are so strong that they overcome the opposing *prima facie* case and leave no substantial dispute: Tetlow's Estate, 269 Pa. 486.

In the case at bar we can freely say that, in our judgment, the evidence of the appellees clearly outweighs that of the appellants, and were a verdict given by a jury for the appellants, we would feel constrained to set it aside. From the *dictum* as laid down in the case just cited, we would not feel justified in awarding an issue.

Ordinarily, a presumption of undue influence arises where a testator's mind is shown to have become weak, and his estate, or a large part thereof, is given to one with whom he is having meretricious relations, and the mind of the testator must be controlled at the time and in the very act of making his will: Kustus v. Hager, 269 Pa. 103.

In the case at bar we have no evidence whatever tending to show meretricious relations in any sense. We do, however, have a parental care on the part of the testator towards John and Florence, and a filial regard and affection on their part toward the testator.

An issue *devisavit vel non* on the ground of undue influence will be refused when the most that can be found from the testimony is that there was opportunity for the exercise of influence: McNitt's Estate, 229 Pa. 71.

And in this case we have no proof whatever of any influence ever being attempted to be exercised. No testimony was produced tending to show that Albert Boone was ever requested to favor either John or Florence in the disposition of his worldly possessions, except that of the Millingtons, which is flatly denied by both the beneficiaries.

To sustain the charge of undue influence in the making of a will, the contestant must show that the testator's mind was under such control at the time of the making of the will, and this has not been done in this case. In fact, we are led to believe from the testimony that they both manifested nothing but a tender regard for the comfort and welfare of the decedent.

The evidence must be such that if an issue be granted and the jury find a verdict against the will, the court would be satisfied that the finding was in accordance with the evidence, or the weight of the evidence, and would refuse to disturb the verdict: Wainwright's Appeal, 89 Pa. 220; Cauffman v. Long, 82 Pa. 72; Yorke's Estate, 185 Pa. 61.

In the light of the testimony submitted and the authorities cited, we cannot see our way clear to award an issue.

And now, to wit, Sept. 22, 1924, in accordance with our views herein expressed, the appeal is dismissed, at the costs of the appellants.