## Bhare Estate

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

*Joseph B. Quinn* and *Roger John Soens*, for proponents.

*Ernest Ray White* and *Joseph T. Murphy*, for contestants.

LEFEVER, J., April 2, 1954.—This is a will contest between a brother and a sister, involving the estate of their deceased sister. The will was challenged on the grounds of (1) fraud, and (2) undue influence. Pursuant to stipulation of counsel the appeal from the register was heard by Judge Saylor, with a jury present. At the close of the testimony he granted an issue devisavit vel non on both grounds. The jury found that there was no fraud, but that there was undue influence. Motions for new trial and judgment non obstante veredicto have been filed by proponents. The jury's finding as to fraud has not been attacked. Therefore, the sole question before the court is whether contestants made out a case of undue influence.

Testatrix was a widow, 70 years old. For the last 10 years of her life she was in serious physical condition. She suffered from angina pectoris, arterio sclerosis of the heart, low blood pressure, chronic gall bladder and kidney disease (which caused swelling of her abdomen and legs), and incidental gastric disturbances. She was subject to recurrent heart attacks which caused excruciating pain. Each attack carried with it the threat of immediate death. In fact, she died in one of these attacks.

Dr. William Klinman attended her throughout the 10-year period. During the last year of her life, he visited her twice daily and sometimes thrice. He prescribed digitalis, nitroglycerine, atropine and adrenalin. In severe attacks he injected a quarter grain of morphine to ease the pain. In addition, three or four times a week on his night call during the last year he gave an injection of morphine with atropine sulphate to induce sleep. Of these drugs, only morphine affects the patient mentally, and that but temporarily.

Decedent's physical condition became aggravated following the sudden death of her husband (resulting from a fall while picking cherries from a cherry tree

in their garden) on June 28, 1952. This was an intense shock to her. It was ever on her mind thereafter and was the constant subject of her conversation. Because of her dangerous physical condition, Dr. Klinman permitted her to attend the viewing of her deceased husband for only one hour and prohibited her from joining the funeral procession to the cemetery in Shoemakersville.

Despite testatrix's physical ailments, it is undisputed that she was usually mentally alert. Testamentary capacity was conceded by the contestants.

Norman H. Murdock, decedent's brother, rushed to her assistance upon her husband's death; made the funeral arrangements; accompanied her to the savings bank where the account in the joint names of decedent and her husband was transferred into decedent's name (despite Murdock's urging that it be placed in the joint names of himself and decedent); cashed his life insurance policies; collected his employment checks and railroad retirement, and purchased from decedent the Buick car formerly owned by her husband for $1,250 under a written contract which was the controversial subject of much testimony at the hearing. In September 1952 decedent signed a renunciation of her right to administer her husband's estate in favor of Murdock and, in February 1953, *after* the death of decedent, Murdock qualified as administrator of the husband's estate.

Early in July 1952 Edna May McCrosson, decedent's sister, and her daughter, Frances McCrosson, moved into decedent's home and lived there until December 1952, when they all moved into Mrs. McCrosson's home, where decedent continued to reside until her death on February 10, 1953. Murdock regularly visited decedent until she moved into Mrs. McCrosson's home. Thereafter, he was conspicuous by his absence. However, his son, Norman, Jr., occasionally visited decedent and did various chores for her.

On July 1, 1952, before decedent's husband was buried, Murdock prevailed upon decedent to execute a will which, at his instance, was brought to her home by one Metzger, a notary public. The notary public had had the will drafted by a lawyer. This will divided decedent's estate equally between Murdock and Mrs. McCrosson, and named Murdock executor. It was executed by decedent in the presence of Edna and Frances McCrosson, Murdock and his wife, the Murdocks' son and daughter, the notary, and a neighbor. Later in the day, at the request of decedent, Dr. Klinman, who did not see her sign the will, added his name as a witness.

On August 14, 1952, decedent executed the disputed will. This will gives $200 to Murdock and the rest of the estate in equal shares to Edna and Frances McCrosson, and names Dr. Klinman as executor. (Both wills of July 1, 1952 and August 14, 1952, fail to mention decedent's two nieces, who are the daughters respectively of a deceased brother and a deceased sister).

It appears that decedent told Dr. Klinman in the course of his professional visits that she was dissatisfied with the will of July 1, 1952, and wished to have a lawyer draw a new will. She requested Dr. Klinman to suggest a lawyer. He recommended Roger J. Soens, Esq. Pursuant to decedent's request, he brought Mr. Soens to decedent's home on one of his professional visits in early August, and introduced him to her. In the presence of Edna and Frances McCrosson and Dr. Klinman, testatrix told Mr. Soens that she wished her estate to be distributed: $200 to Murdock, and the residue equally to Edna and Frances. Apparently, Mr. Soens did not inquire as to the extent of her estate nor as to who were her relatives. Decedent showed him the will of July 1, 1952, which he read. He testified that he did not inquire with regard

to the reduction in size of the gift to Murdock because Dr. Klinman had explained to him that decedent's desire for a new will with this reduction to Murdock was impelled by her dissatisfaction with Murdock's handling of her husband's affairs and her belief that he had taken advantage of her in the purchase of her husband's Buick automobile and had misappropriated part of the $100 she gave him to cover the expenses of the members of her husband's funeral procession to Shoemakersville.

Mr. Soen made notes of decedent's instructions (which were mislaid or destroyed prior to trial) ; returned to his office; and drew the will in final form. On August 14, 1952, he returned to decedent's home with the disputed will. Present were Edna and Frances McCrosson, Mr. Soen and decedent. Mr. Soen read the will aloud to testatrix and explained the various legal terms and provisions. Testatrix indicated she was satisfied with it. Thereupon, testatrix executed the will and Mr. Soen and Mrs. McCrosson signed as subscribing witnesses. Mr. Soens testified unequivocally that neither Edna nor Frances McCrosson, nor Dr. Klinman made any suggestions to testatrix with regard to the provisions of her will either at the first conference or at the execution of the will. The only discussion was with regard to the division of furniture as between Mrs. McCrosson and Frances.

Dr. Klinman testified that he treated testatrix twice on August 14, 1952, the first visit being between 11 and 12 o'clock in the morning, and the second visit being between 9 and 10 o'clock that night. The will was executed shortly before his second visit. He did not administer opiates at the first visit. Therefore, he was certain that testatrix was mentally alert and keen at the time of the execution of the will. He said that she was physically tired but otherwise in good condition, mentally and physically, when he visited her that night.

Mr. Soens was of the firm opinion that testatrix knew exactly what she was doing and that the will accomplished her wishes. Mrs. McCrosson corroborated Mr. Soens' testimony, although she was vague at points.

There was a conflict of testimony as to whether decedent could read and write. It is to be observed that all interested parties admit she signed the will of July 1, 1952. In any event, irrespective of the correct answer to the question of decedent's literacy, it is undisputed that Mr. Soens read and explained the disputed will to her, before she executed it. This is conceded in contestants' brief. It is noteworthy that sometime after decedent executed the disputed will, she "tore up and burned" her copy of the will of July 1, 1952.

There was also a conflict of testimony regarding the relations of Mrs. McCrosson and Murdock respectively with decedent and decedent's affection for them. Proponents testified that decedent much preferred Mrs. McCrosson and her daughter and was upset over the actions of her brother, Norman, for the reasons herein previously stated. Contestants insisted that Murdock and his family had been intimate with decedent for many years until she moved into the home of Mrs. McCrosson in December 1952, and that in contrast, the McCrossons had been almost strangers to decedent. It is clear that Murdock did not know of the existence of the will of August 14, 1952, until after decedent's death.

The court is confronted with the unseemly spectacle of a brother and a sister apparently more intent upon the assets of an ailing sister than in her personal welfare. Murdock pressed decedent into executing the will of July 1, 1952, during decedent's period of shock and stress immediately following her beloved husband's sudden and unexpected death, and *while his body lay unburied.* On the other hand, as soon as Mrs. McCrosson discovered decedent dead in her chair, *before the*

*undertaker could arrive,* she lifted her dress and extracted from her stocking a packet in which decedent carried money and the key to the safety box in her wardrobe where the disputed will was lodged. Moreover, at the instance of Mrs. McCrosson the will was probated and letters testamentary were granted on February 13, 1953, *before decedent was buried.*

Murdock testified that he learned of decedent's death when he returned from work late at night. At eight o'clock the following morning he telephoned Mrs. McCrosson "with expectations of getting ready to make the funeral arrangements". The following is his testimony as to the telephone conversation:

"She says, 'You don't need to worry about that at all. I'm boss of this thing this time'. 'Why', I said, 'how so?' 'Why', she said, 'Sister has another will made and I tore the other one up.' I said, 'O.K.' and I hung up. That's the last I spoke to her. I haven't spoken to her."

So exasperated with this turn of events was Murdock that he didn't even attend the funeral of decedent, whom he professed to regard so affectionately.

Bitterness, jealousy, animosity, even outright hatred, between the sister and brother, is evident throughout the notes of testimony. Murdock did not know the date of his sister's marriage. For years, he didn't know where she lived. He had seen her on only a few occasions over a period of 30 odd years. He has had no contact with her since decedent's death. Mrs. McCrosson demonstrated equal disregard and lack of affection for her brother.

Mrs. McCrosson denied ever requesting testatrix to change her will. However, there would seem to be no doubt that decedent was influenced in making her will of August 14, 1952, by the presence of the McCrossons in her household; the fact that they attended her during her illness and were close to her; and the fact that

(with or without cause) decedent was irritated with her brother. However:

"Kindly care and solicitous attention do not amount to undue influence. Advice or even persuasion while a person is a member of one's household is not improper. Legitimate family and social relations are not prohibited though provisions of a will are thereby influenced and affected; such results are their natural and proper products": Brennan's Estate, 312 Pa. 335, 337 (1933).

Undue influence is defined " ' as denoting . . . something violative of legal duty. . . . The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self directing mind, but to a control acquired over another which virtually destroys his free agency. . . . In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will.' " (Phillips' Estate, 244 Pa. 35, 43 (1914)), or, " 'As that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist' ": Robinson v. Robinson, 203 Pa. 400, 434 (1902).

The record in this case is singularly lacking in evidence that the mind of decedent was imprisoned or that she was coerced by threats or force into executing the disputed will. At most the contestants have made out a case of *suspicion* that the McCrossons may have exerted improper influence upon decedent or poisoned her mind with regard to Murdock. Mere suspicion is not enough to set aside a will: Royer's Estate, 339 Pa. 423, 425 (1940). Particularly applicable is the language

of Mr. Justice Stearne in May v. Fidelity Trust Company, 375 Pa. 135, 142 (1953) :

"The testimony on behalf of contestants in support of their allegation of undue influence is wholly circumstantial. No witness of either proponents or contestants testified that Mr. or Mrs. May had ever mentioned in their hearing the subject of will or testamentary disposition. Certainly no evidence of importunity to make any testamentary disposition by any of proponents appears in the record."

The sanctity of wills is one of the most important heritages of a citizen in a free country. Although the court or the jury may be of the opinion that in fairness and justice decedent should have provided otherwise in her will, it is not their province but that of decedent to determine which of her relatives or friends should receive her estate and in what proportions.

"The growing disposition of courts and juries to set aside last wills and testaments, and to substitute in lieu thereof their own notions as to what a testator should do with his property, is not to be encouraged. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of it. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances testamentary dispositions of property seem harsh, if not unjust, the result, perhaps, of prejudice as to some of the testator's kindred, or undue partiality as to others. But . . . It must be remembered that in this country a man's prejudices are a part of his liberty. He has a right to them; he may be unjust to his children or relatives; he is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and under-

standing to make a will, and such instrument is not the result of undue influence, but is the uncontrolled act of his own mind, it is not to be set aside in Pennsylvania without sufficient evidence, nor upon any sentimental notions of equality.": Cauffman v. Long, 82 Pa. 72, 77 (1876).

It is urged that Dr. Klinman and Mrs. McCrosson were in a confidential relationship with decedent and, therefore, the burden of proof shifted to them to prove *no* undue influence.

" 'In general it may be said that a confidential relation will be deemed to exist whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence over the other . . . :' McCown et al. v. Fraser et al., 327 Pa. 561, 565"; Stewart Will, 354 Pa. 288, 296 (1946).

To shift the burden of proof the one in confidential relation must benefit substantially from the will: Conway Will, 366 Pa. 641 (1951).

Dr. Klinman had the confidence of decedent. At her request he arranged for Mr. Soens to meet decedent and draw the will in question. However, he is not a beneficiary under the will. An executor's fee is paid for services rendered. It is not a benefit under the will, at least for a busy physician in an estate of $9,000. Therefore, the rule does not apply to him. (See Wetzel v. Edwards, 340 Pa. 121, 124 (1940)).

Mrs. McCrosson and her daughter are substantial beneficiaries. However, there is real doubt as to whether they were in a confidential relationship as defined supra. Moreover, evidence is lacking that decedent was of weakened intellect.

"If . . . the confidential relationship is not coupled with weakened intellect the burden of proof in will cases is upon those asserting undue influence." Wil-

liams v. McCarroll, 374 Pa. 281, 295 (1953). Therefore, the burden of proof did not shift to them.

It is regrettable that Mr. Soens held both the preliminary conference with testatrix and the will execution ceremony in the presence of the McCrossons. It would have been wiser for him to have insisted upon conversing with decedent alone. Moreover, if he had followed recommended practice he would have carefully questioned decedent upon the three essential requisites for a valid will, namely: (1) Who were her relatives and natural objects of her bounty; (2) what were her assets, and (3) whom did she wish to benefit under her will (this would have included interrogation as to her reasons for cutting down Murdock's share). However, these are not fatal defects, especially where testamentary capacity is not in issue. They do not prove undue influence (especially where the scrivener in no wise benefited under the will).

We are all of the opinion that there is insufficient evidence in this record to have warranted the proper granting of an issue devisavit vel non on the question of undue influence. There is here no "substantial dispute of fact" concerning the validity of the disputed will required by section 745(a) of the Orphans' Court Act of August 10, 1951, P. L. 1163, to grant an issue. It follows, therefore, that the verdict of the jury must be set aside and judgment non obstante veredicto entered.

It is noteworthy that Judge Saylor, who heard the testimony and saw the witnesses, is of the opinion that the contestants failed to make out a case of undue influence. He so stated at the argument.

The court has considered this case upon the entire record as though the matter were before the court en banc on exceptions to a grant of an issue devisavit vel non, prior to the jury trial. Viewed in this matter, the

court has considered all of the evidence with such inferences as may flow therefrom.

Section 746(c) of the Orphans' Court Act of August 10, 1951, P. L. 1163, provides:

"The verdict of the jury in the orphans' court shall have the same effect as the verdict of a jury in a case at law in a court of common pleas." Neither the interpretation nor constitutionality of this section of the act was raised in this case. However, it is our opinion for the reasons hereinbefore stated that even though all of the inferences in this case be resolved in favor of the verdict and all the inferences contrary to it be rejected, the verdict must be set aside and judgment rendered for proponents.

Accordingly, we hereby order and decree that the verdict of the jury shall be set aside; the will of August 14, 1952, is hereby declared valid non obstante veredicto, the appeal from the register is dismissed, and the record is remitted to the register.