## Sommerville Estate

*G. Hayward Reid,* for proponent.

*Bernard L. Frankel* and *Charles M. Solomon,* for contestant.

*Barbara Ann Duffy,* for executor.

*Hugh P. Connolly,* for Commonwealth.

LEFEVER, J., May 12, 1961.—The voluminous record in this case fully supports the verdict of the jury that testatrix was suffering from monomania, or an insane delusional fixation against her only living child, Margaret S. Russell, and, therefore, was not of sound and disposing mind at the time she executed her alleged

will.[1] The learned trial judge approved the verdict. A careful and thorough review of this record brings us unerringly to the same result.

The record is replete with evidence that testatrix rejected her only child, Margaret, from birth. As explained by the eminent psychiatrists who testified in this case, this rejection was the result of a guilt complex suffered by testatrix because the child was born out of wedlock. The consequent monomania[2] caused her to endeavor to transfer that guilt from herself to her child. This made it impossible for testatrix to view her child in a normal and sane manner. A summary of this evidence follows.

On June 12, 1890, testatrix, an unmarried domestic, gave birth to her only living child, Margaret, the contestant. During most of the early years of her life, Margaret lived with a godmother. On August 12, 1892, testatrix and Margaret's father were married in a formal religious ceremony, thereby legitimating Margaret. Several months thereafter her parents permanently separated. Margaret never saw her father. When Margaret was five years old, testatrix placed her in the Philadelphia Orphans' Asylum where she remained until she was 17 years old.[3] During that entire period, the child's formative years, testatrix, who lived and worked in Philadelphia, visited her only eight times. There were intervals of as long as two and one-half years between visits.

---

[1] The question propounded to the jury was in traditional form: "Was the decedent, Margaret Sommerville, at the time of the execution of said writing, a person of sound and disposing mind?" The verdict was "No."

[2] "Monomania" was the name for this malady for many years. More recently the nomenclature is "paranoia," or "insane delusion," or "paranoid schizophrenia."

[3] The Philadelphia Orphans' Asylum was located at Sixty-fifth Street and Lansdowne Avenue until contestant was 14 years old. It then moved to Wallingford.

When Margaret was 17 years old, she was "bound out" by the orphanage to a private family as a child's nurse, where she received board and room and the minimal wage of $.50 per week, and lump sum of $50 upon reaching 18 years of age. Without prior arrangement or warning, testatrix appeared one day at Margaret's employer's home when she was 18 years old and told her to pack her clothes and come home with her. The employer called the orphanage and the latter refused to permit the girl to go with testatrix because she had no place to keep her daughter; testatrix was then employed in a mill in Paterson, N. J., and lived in a furnished room in that city. Margaret did not hear from, or see, her mother thereafter until 1922, 14 years later, although she tried in vain to do so. In 1922, testatrix needed $2,000 to finance the purchase of a house. She sought out Margaret, and the latter and her husband lent that money to testatrix, and it was later paid back.

From 1922 to 1928, testatrix saw contestant only six times. From time to time during this period, contestant unsuccessfully endeavored to locate her mother through her lawyers and real estate agents. But testatrix concealed her address. However, during that period, testatrix wrote a barrage of letters to Margaret. As pointed out by psychiatrists, these letters showed an ambivalence, a rejection of her daughter, an attempted transference of her guilt to her daughter, a delusion so extreme that the sight or even the thought of her daughter caused her physical pain. For example: "I have put in a most awful night with pain up my face . . . you will have to keep away from me." "Please dont come to see me now or at any time . . . away from you I am satisfied pleasant and contented." "I am not angry with you I am terribly repelled and disgusted by you." "I dont ever want to see you now or any other time. You will never see me again. I am

not sore at you or angry at you the only feeling I have for you is a feeling of disgusted contempt." "I refuse to see you . . . you get on my nerves I couldn't stand you and I feel so absolutely distugested (sic) that I am very happy to think I dont have to see or hear from you" "I dont want you to bring James to see me I have to consider my own health and you are all too hard on my nerves." "alive I wont look on your face and dead you wont look on mine" "I am not even angry I am saying this in cool blood I am never going to see you again."

These are only samples. The same theme is repeated with montonous regularity in the same letter and in successive letters. The psychiatrists testified at length that these letters are irrefutable evidence of testatrix' rejection of her daughter and of her guilt transferal. The letters are unpunctuated and uncapitalized. They were written in column form, with irrelevant inserts in the margins, side, top and bottom. They are the repetitious rantings of a tormented and demented mind. These letters alone confirm the jury verdict. Medical testimony is not necessary to brand the writer as *not normal*, certainly not a *normal mother*. Significantly, testatrix projected her bitterness and hatred even to her only grandson, Margaret's son, James, whom she never saw after he was nine years old.

In 1928, on the advice both of Dr. Tait, contestant's father's cousin, and her counsel, contestant filed a petition in the Common Pleas Court of Philadelphia to have testatrix adjudicated incompetent. In connection therewith, Dr. Samuel Leopold made a physical and psychiatric examination of testatrix on September 27, 1928. At the incompetency hearing, Dr. Leopold was present, prepared to testify that in his professional opinion testatrix was then delusional, senile, apt to become a victim of designing persons and mentally incompetent. However, the hearing judge, after

conference with counsel in chambers and in an effort to avoid exaggeration of the antagonism which testatrix had theretofore manifested toward contestant, accepted the promise of testatrix' counsel that she would place all of her assets in trust with the Land Title Bank and Trust Company in lieu of a decree of incompetency. Relying upon this agreement, the court accepted a withdrawal of the petition. Testatrix failed to comply with this promise.

Thereafter, testatrix refused to see contestant or her grandson. Contestant next saw her two weeks before her death in 1958. During her intervening 30 years, contestant, singly and in the company of her husband, made three separate trips from their home in New York to testatrix' home in Philadelphia. On each occasion, testatrix refused to admit or see contestant, although "she peeked at them from behind the curtains." Contestant wrote innumerable letters, sent birthday cards and Mother's Day cards, etc. Most of them were returned unopened. Testatrix failed to communicate with contestant throughout this entire period. Testatrix moved from place to place and directed every person who had knowledge of her successive addresses not to communicate them to contestant. Contestant addressed inquiries to postoffice officials, the Philadelphia police and others in an effort to locate her mother. Finally, contestant learned the name of her mother's attorney and communicated with him in an effort to see her mother. However, she was informed by Robert F. Lehman, Esq., under date of July 27, 1953, that testatrix would not see her and "does not wish that you know her whereabouts." At this time testatrix was ill in a nursing home. Finally, two weeks before testatrix' death, the head of Thoroughgood Nursing Home notified contestant of her mother's second apoplectic stroke and grave illness. Contestant immediately came from New York to see testatrix and saw

her for a few minutes while she was in a comatose state. Contestant only learned of her mother's death and the date of her funeral by telephone inquiry to the Thoroughgood Nursing Home.

On October 22, 1945, testatrix executed a will drawn by Henry J. Rebman, Esq. It gave $2,000 to her daughter, Margaret, with an "in terrorem" revocation in the event of contest; $1,000 to her grandson, James; and the residue of her estate, which according to the evidence is in excess of $50,000, to a casual friend, Mrs. Martha Elizabeth Guy. When she executed the will, testatrix was aged 85 or 87, the record is not clear on this point, and in questionable state of health. The scrivener and the witnesses are dead. Hence, we do not have the benefit of their testimony respecting the preparation and execution of the will.

Proponent urges that three acts of contestant explain and justify testatrix' amazing conduct, namely: (1) her refusal to leave immediately the home of her employers in 1908 in response to testatrix' sudden and unexpected visit and request; (2) her failure to return a deed to testatrix' cemetery lot on testatrix' request in 1923, contestant wrote her mother that she would hold the deed for her and see to it that she had a proper burial in the event of her death; and (3) her institution of the incompetency proceedings. These acts seem relatively trivial and unimportant. It is significant that testatrix had rejected her daughter before any of these occurrences. It is clear from the record that the act for which testatrix condemned contestant was her unwanted, illegitimate birth. She was scarcely responsible for this! But in her tortured mind, testatrix made her so. In any event, it was the jury's prerogative to decide whether these three acts of the daughter were sufficient justification for testatrix' settled contempt and hatred which resulted in her almost complete disinheritance, or whether it was

proved that testatrix suffered from insane delusions.

Dr. Samuel Leopold, psychiatrist and neurologist of 58 years' experience, 40 of them as director of the mental clinic of the Philadelphia Municipal Court, which he founded, testified that from his physical and psychiatric examination of testatrix in 1928, it was his opinion that she then exhibited senile dementia, insane delusions and paranoia. In his opinion, when he examined testatrix in 1928, she was incapable of forming a rational intelligent opinion with regard to her daughter. He was present in court throughout the several days of the will contest and he examined the above mentioned letters from testatrix to her daughter which were placed in evidence. He was unequivocal that the testimony and these letters showed a constant progression of testatrix' delusional state. It was his definite opinion that testatrix was not capable of viewing her daughter as a normal person nor in comprehending sanely or rationally her relatives and the natural objects of her bounty in 1945, when she executed her will, because of her insane delusions with regard to her daughter. Therefore, in his opinion, testatrix was not capable of making a valid will on October 22, 1945.

This opinion was corroborated by Dr. Norman G. Anderson, psychiatrist, who never examined testatrix and was called solely as an expert on the basis of the evidence produced at the trial. He diagnosed testatrix as a paranoid schizophrenic. Necessarily, his testimony is of much less weight than that of Dr. Leopold, because he did not see testatrix. Dr. Leopold actually examined her at a crucial time: Masciantonio Will, 392 Pa. 362, 384. We have considered Dr. Anderson's testimony within the limits of the cited case.

Both physicians stated that monomania or insane delusions, now designated paranoia or schizophrenic paranoia, is a well-known phenomenon in psychiatry.

It is the name for the mental derangement of an individual who subconsciously transfers a real or fancied guilt to another person. In the opinion of these physicians, testatrix was unable to bear the shame she felt for bearing an illegitimate child, notwithstanding the fact that the child was later legitimized by formal marriage with the child's putative father. This ultimately resulted in testatrix subconsciously transferring her guilt from herself to her daughter. All the shame accompanying it was also transferred to the daughter. It then produced the delusions with regard to her daughter expressed in testatrix' own words of "disgusted contempt" . . . "I never want to see you again," etc. This even extended to her daughter's child, James, testatrix' grandson. It is noteworthy that a person suffering from such insane delusion may, in every other way, be sane, even normal. Therefore, testatrix' frugality, her shrewdness in amassing a sizeable estate, her handling of her real estate, the seemingly rational letter explaining her refusal to appoint a trustee to handle her property, and her apparently rational statements to her attorney about her property, do not negate her insane delusions or paranoia with respect to her daughter.

In summary, there is ample evidence in this record to demonstrate that testatrix never had a normal mother's affection for her daughter nor acted toward her in normal fashion. It is clear that testatrix for many years had delusions with regard to her daughter. Her rejection of the daughter started at birth, or before. All of this made it impossible for her to view her daughter as a normal testatrix would and, therefore, in the eyes of the law she lacked the proper mental capacity to execute the disputed will. The jury believed this evidence.

There remains the sole question as to whether there was material error in the judge's charge.

We have read and reread the charge. It properly states the requisites in a will contest. The judge's definition of monomania was legally and medically correct, viz.: [4]

". . . a person may be of sound mind in regard to his dealings in general, but he may be under an insane delusion, and whenever it appears that the will was directly affected by the partial insanity or monomania under which the testatrix was laboring at the time she executed the will, that it was the moving cause of the disposition, and if it had not existed the will would have been different, the will is invalid despite the general mental capacity of the testatrix, the testatrix being Margaret Sommerville, who made the will."

This language is almost a direct quotation from Thomas v. Carter, 170 Pa. 272, 282, quoted with approval in Weiss Will, 366 Pa. 456, 460, and in Leedom Estate, 347 Pa. 180, 181.

Proponent relies upon Alexander's Estate, 246 Pa. 58; Doster's Estate, 271 Pa. 68, and McGovran's Esstate, 185 Pa. 203. There testators were arbitrary in their exclusion of close relatives, but the court found no evidence of insane delusion. Of critical importance, all of these cases came to the Supreme Court on appeal from refusal to grant an issue d. v. n. As stated in Doster's Estate, at page 72: ". . . there must be an abuse of discretion by the hearing judge who sits as chancellor when an issue is refused, before this court will reverse." In our case, without objection from proponent, a jury trial was held and the *jury found insane delusion*. The instant case is more like Weiss Will,

---

[4] On the psychiatric aspect, see Dr. Arthur P. Noyes "Modern Clinical Psychiatry" (1935), particularly chapter XI on "Paranoia and Paranoid Conditions"; and Noyes and Kolb, "Modern Clinical Psychiatry" (5th ed., 1958), particularly the chapters on "Psychotic Disorders."

supra, Leedom Estate, supra, and Dovci Will, 174 Pa. Superior Ct. 266, where insane delusion was found.

Proponent extracts out of context an excerpt from the charge re contestant's points 3 and 5 and complains that the trial judge placed improper emphasis on the good faith of the daughter in bringing the incompetency proceedings. Per contra, when the entire charge is read, including the *whole paragraph* dealing with contestant's point no. 3, it is clear that insane delusion is correctly defined and that the trial judge properly and clearly presented to the jury the question whether testatrix' reaction to contestant's institution of the incompetency proceedings was the reaction of a normal person or that of one suffering from an insane delusion. We find no error on this point. However, even if the language here used be considered inept, it is not material error. No objection was made to it by exceptant's counsel, despite the fact that the trial judge, before sending the jury out to deliberate, inquired whether there were any objections, suggestions or exceptions to his charge. The only possible ground upon which we are justified in considering it at all, is the sweeping exceptions voluntarily granted by the trial judge. We will not lightly set aside a verdict rendered after days of trial for a trivial error where counsel sits idly by, satisfied with the charge and who, after an adverse verdict, scrutinizes the record microscopically.

Proponent's points 7 and 9 were not in themselves well founded; the matter therein was covered generally in the charge; the points as written were properly refused; and, in any event, no material error was committed.

Proponent now vainly struggles to find error in the trial. She voiced no objection to the judicial act of the learned trial judge in ordering a jury trial. She was

satisfied with his charge. She voiced no objection of any note to it. Now, she tilts at windmills. For example, her counsel argue at length in their brief that the testimony of contestant-daughter was inadmissible under the Dead Man Act of May 23, 1887, P. L. 158, 28 PS §322. Judge Hunter in his well known treatise states: "If the issue or inquiry be *devisavit vel non*, all parties shall be fully competent witnesses:" I Hunter Pennsylvania Orphans' Court Commonplace Book, 2d, §13(a), page 385, and cases cited. Section 5(e) of the Act of May 23, 1887, in plain language, specifies the exception ". . . or, unless the issue or inquiry be *devisavit vel non*, . . .": page 160. Moreover, from time immemorial, the testimony of interested relatives has been received in will contests.

Proponent presented evidence indicating testatrix' competency. A question of fact was raised. The jury believed contestant's witnesses and disbelieved proponent's witnesses. The trial judge, the thirteenth juror, approved the verdict. That is the end of the matter.

The concluding words of our late distinguished colleague, Judge Hunter, in Edmunds Estate, 81 D. & C. 576, 585, affirmed 374 Pa. 22, are peculiarly applicable here:

"It is a satisfaction to know that under our decision the estate will go exclusively to descendants of testator, and that no part of it will pass out of the family to a stranger to the blood."

Here the estate goes to the only daughter. Money is a poor substitute for a mother's love. However, testatrix' estate may provide some material comfort to her daughter, 71 years old, during her declining years and in some small measure compensate her for the long years of rejection and deprivation of parental affection and care.

In the language of the Supreme Court in Leedom Estate, supra, page 185, where the jury found a will invalid because of monomania: "This case was ably and carefully tried, it was submitted to the jury in a charge free from material error, the verdict is well supported by the evidence, and in this situation we can see no reason to interfere with the judgment entered thereon."

## Decree

And now, May 12, 1961, motions for judgment n. o. v. and for a new trial are refused, and judgment is now entered upon the verdict.

Further, probate of the writing dated October 22, 1945, as the last will and testament of Margaret Sommerville, deceased, is set aside, and the record is remitted to the register of wills.

Bolger, J., dissenting.