# Bennett's Estate.

*Will—Issue devisavit vel non—Lunacy—Insane delusion.*

In determining whether a testator was the victim of an insane delusion which affected his testamentary act, it is never a question of soundness of view, but the proper inquiry always is whether he imagined or conceived something to exist which did not in fact exist, and which no rational person in the absence of evidence would have believed to exist.

A testator of acknowledged general testamentary capacity cannot be proved to have been the victim of an insane delusion as to the illegitimacy of the contestant of his will, where the evidence shows that his belief in the illegitimacy of the contestant was founded upon his suspicion of the fidelity of his wife, confirmed by her confession to him of her misconduct, and, subsequently, to other persons, that he was not the father of her child, followed by prompt application for a divorce, which was not contested by his wife, and a final decree of separation thirty years before the execution of his will.

Argued Jan. 6, 1902. Appeal, No. 89, Jan. T., 1901, by Imogene E. Bennett Wellens, from decree of O. C. Phila. Co., April T., 1899, No. 18, dismissing appeal from register of wills in Estate of Joseph M. Bennett, deceased. Before McColLUM, C. J., MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Appeal from register of wills.

HANNA, P. J., found the facts to be as follows:

On November 25, 1890, testator executed his holographic will with extreme care and particularity and an evident familiarity with the form and language usually employed in the preparation of such an instrument and the legal requisites to its validity. By it he bequeathed pecuniary legacies and devises to numerous persons therein named, particularly identified his kindred and those related to them and many other legatees, and also clearly indicated the charitable and educational institutions he intended to benefit. On June 29, 1895, he republished his will by the execution of a codicil: Eastwick's Est., 8 W. N. C. 503; Armstrong's Estate, 2 Pa. C. C. Rep. 166.

Again, on August 5 of the same year, by the execution of a

second codicil.   Again, on December 9, 1896, by the execution
of a third codicil.   And on July 8, 1897, by the execution of
a fourth codicil.   All are in his handwriting, and each prepared
and executed with the same care and particularity and recogni-
tion of legal formula seldom displayed by a layman.   But in
neither will nor codicils is mentioned testator's wife, from
whom, on November 7, 1868, upon her application, he was
divorced a vinculo matrimonii, but to whom he subsequently
paid an annuity of $1,200 until her death in April, 1896, nor
the contestant, who claimed to be his legitimate daughter, but
his paternity of whom testator refused to recognize since early
in 1859.

He lived until September 29, 1898, when he died, at the age
of more than fourscore years, numbered among the millionaires
of this great city, and by his industry and enterprise in busi-
ness, acuteness and shrewdness in purchases and investments,
economy and thrift, bordering, perhaps, upon parsimony, in his
personal and private expenditures, he accumulated, in real and
personal estate, a fortune of at least $2,000,000.   The contes-
tant, who, so far as appears, never asserted her legitimacy to the
testator during his lifetime, nor claimed recognition from him,
although, as stated, he contributed towards the support and
maintenance of her mother, during a period of more than twenty-
seven years, now claims to set aside the will of her alleged father
upon the ground that it and the subsequent codicils constitute
an unnatural and inofficious testament; and that at the time
of their execution in November, 1890, and subsequent years,
he was not of sound mind and capable of making a valid will.
But with a candor and frankness which could not be avoided
in the light of the testimony, even that produced by the con-
testant alone, the allegation in her petition that testator did
not possess testamentary capacity was qualified at the hearing
by the admission by counsel that testator did possess general
testamentary capacity at the date of the execution of the will
and codicils, but was a victim of monomania and executed the
testamentary paper disinheriting his lawful child under the
influence of a delusion as to the unfaithfulness of his wife and
his paternity of the contestant, and therefore was partially in-
sane.

The contestant accordingly claimed that under the facts

proved an issue should be awarded for the trial by a jury of the question raised.

The present inquiry therefore is, after a careful consideration of " all the pertinent evidence," has sufficient proof been shown that testator, at the date of the execution of his will and thereafter, until his death, was influenced by the existence of a monomania or insanity produced by a delusion influencing the testamentary disposition of his estate, which was unfounded, and, to such an extent as induced him to disinherit one whom he, more than thirty years prior to the execution of his will, believed his lawful child, but thereafter refused to recognize as such ; and to justify on this ground a verdict against the validity of his will.

At the date of his will in 1890, the bonds of matrimony with his wife had been dissolved, upon her complaint, for a period of almost twenty-three years, so that she lost and abandoned any interest in his estate, and his right to deprive a child or children of any participation therein cannot be questioned, and is wholly independent of whether the actual fact with regard to his relationship to them was or was not what he supposed. PENROSE, J., in Padelford's Estate, reported in 190 Pa. 41. Testator had refused to recognize contestant as his own offspring, since early in 1859, more than thirty years prior to the execution of his will. No claim was afterwards made by her or her mother, either for her recognition or maintenance, and that testator's former wife, after her divorce from him, accepted the provision for her without asserting a similar claim on behalf of her child is significant.

The testimony fails to disclose that the will of the testator was made by him with any reference to the contestant whatever. No declarations were made by him at the time showing that she was even in his memory or recollection, and, so far as appears to the contrary, she had entirely passed from his life. If it, however, was made manifest he had denied her all participation in his estate, influenced and impelled by cruel, unfounded and baseless beliefs that existed only in his preverted imagination, and the will was made under their influence operating at the time of the testamentary act, the case would be far different. Then it might be said, with some degree of certainty, testator disinherited the contestant influenced by an

insane delusion, and to warrant the submission of a question to a jury. But, as before stated, no reason whatever appears from the testimony, why testator, at the execution of his will in 1890, or its subsequent several republications, ignored one who claims to be his lawful child, and bequeathed and devised his estate, with the utmost deliberation, to numerous friends and relatives and charities in which he was interested. He doubtless had reasons for so doing, satisfactory to himself, but conjecture will not supply the place of proof.

After a laborious consideration of the entire testimony, we fail to discover the slightest evidence that the will and codicils were made, influenced, and controlled by a belief by testator of imaginary facts and the creation of his imagination springing "spontaneously in the mind which rested on no intrinsic evidence of any kind . . . . and which no rational person in the absence of evidence would have believed to exist." As already stated, testator's former wife had no claim upon his bounty, and his firm belief, for more than twoscore years, that contestant was not his lawful child, did not constitute a delusion as to her illegitimacy, when it was founded upon his suspicion of the fidelity of his wife, confirmed by her confession to him of her misconduct, and, subsequently, to other persons, that he was not the father of her child, followed by prompt application for a divorce, which was not contested by his wife, and a final decree of separation in April, 1859. Notwithstanding the decree was vacated in March, 1860, but for what reason does not clearly appear, owing to the loss or misplacement of portions of the record, yet the fact remains marital relations were never resumed by testator and his wife. They remained separate and apart until the latter obtained a divorce in 1868, and thereafter until death. After the relation of these facts it is beyond question that testator was under no delusion as to the paternity of contestant and that he acted throughout the remainder of his long and busy life under the firm belief and conviction she was not his child ; a belief and conviction not imaginary, but founded upon facts communicated to him, supported by evidence, actions, and conduct which any rational person would believe as true and lead to the same conclusion.

It only remains to say that in view of all the testimony a verdict against the validity of the will and codicils upon the ground

of insane delusion of testator at the date of their execution would clearly be contrary to the manifest weight of the evidence, and well known principles of law, and should not be sustained. For the reasons mentioned the issue demanded must accordingly be refused and the appeal from the decision of the register in admitting the will and codicils to probate dismissed.

On exceptions, ASHMAN, J., filed the following opinion:

The testator filled a large place in the public thought as a successful business man and as a philanthropist. He had passed through all the grades of labor, beginning at the humblest, and he died a millionaire. He was, indeed, among the first of those merchants who projected the bolder methods of commercial enterprise which have raised trading to a science. The qualities of mind, without which the history of his career would be a fable—shrewdness, tenacity of purpose, decision and foresight —are fully conceded to him by both parties to this contest over the will. We do not understand it to be denied that when he wrote that instrument his mental force was unabated, and hence, that he was able to make an intelligent estimate of his resources, and an equally intelligent selection of the persons and objects to which they should be applied. If a doubt could exist in any quarter respecting this, it would be dispelled by the testimony which lies before us as to the manner of the making of the will, and especially by the provisions of the will itself. A slight effort, too slight for serious notice, was made to show some traces of eccentricity in the testator; he had a violent temper, and, perhaps, as violent prejudices, and he sometimes, if he is fairly reported, used expressions which would be displeasing to a professor of deportment. But the real ground upon which the contestant planted a hope was that sane as he was upon all other points, the testator was the victim of an insane delusion respecting his wife and her offspring. It must be admitted that a phenomenon like this, whose secret medical science has never yet fathomed, has had an occasional existence, and that through some slight lesion in a brain otherwise normally healthy, a certain grotesqueness has been made to appear in the conduct of the wisest men. We know that Dr. Johnson believed in the Cock Lane ghost, and that Martin Luther flung

an inkstand at what he supposed was the Devil. But all delusions are not insane delusions. A man may, from information given him, believe that his son is dead, when, in point of fact, the son is alive. The father's belief is a delusion; and if, when his son appears to him in person and explains that the information was false, the father persists in thinking him dead, his belief becomes an insane delusion. The difference between the two species is that one is the product of the reason, and the other a figment of the imagination. The belief of the testator rested upon very practical realities—upon confessions, oral and written, made to him and repeated to others, and upon other circumstances which we need not narrate, but which were almost as convincing as confessions. We do not say whether, in our judgment, the confessions were true or false, or whether the circumstances were or were not misleading; but we do say that both were of a character which might fairly persuade a sensible man to the belief which they induced in the testator. He acted under this conviction just as any sane man would have acted; he became for a time indifferent as to his personal appearance, and moody and reserved in his manner; and these very natural expressions of rational grief are sought to be tortured into exhibitions of madness. One of the hypothetical questions addressed to the medical expert asserted that the decedent "heard voices constantly talking about the paternity of his child." The expert replied that he regarded the incident as very significant, because in his opinion, "they were not said by real people, but were the child of the decedent's imagination." What the decedent actually said, however, was that he overheard, by accident, insinuations reflecting on his wife, and that afterwards so many persons made remarks to the same effect that the insinuations seemed to be common talk. To confound, as the framer of the question did, common talk with the voices of disembodied spirits, is to approach very near to an insane delusion.

The president judge, before whom the appeal from the register was originally brought, and who heard the witnesses, has so clearly presented the leading facts of the case, and has so ably analyzed the authorities which bear upon it, that any further discussion will be superfluous. The gist of the decisions upon the point which is now involved is contained in this sentence

1902.]        Opinion of Court below—Opinion of the Court.

from the opinion in Murdoch's Appeal, 185 Pa. 203: "It is never a question of soundness of view, but the proper inquiry always is whether the party imagined or conceived something to exist which did not in fact exist, and which no rational person, in the absence of evidence, would have believed to exist."

The appeal is dismissed.

*Error assigned* was decree dismissing the appeal.

*George P. Rich*, with him *Francis S. Cantrell, Jr.*, and *Francis S. Cantrell*, for appellants.

*John G. Johnson*, with him *William C. Ferguson*, for appellees.

PER CURIAM, February 24, 1902:

The decree of the orphans' court in this case is affirmed on Judge ASHMAN's opinion.