## Leedom Estate.

Argued April 13, 1943. Before Maxey, C. J.; Drew, Linn, Stern, Patterson, Parker and Stearne, JJ.

*William Taylor, Jr.,* for appellant.

*Richard J. Mackey,* with him *Thomas A. Curran* and *John Van Valkenburgh,* for appellee.

OPINION BY MR. JUSTICE DREW, May 12, 1943:

In this issue devisavit vel non, Bertha G. Weaver and William Taylor, Jr., principal beneficiary, and executor and trustee, respectively, under certain writings purporting to be the last will and codicil of G. Howard Leedom, were the proponents, and Laurie M. Leedom, nephew and sole surviving heir of testator, was the contestant. The jury found that testator lacked sufficient mental capacity to make a valid disposition of his estate because he was influenced by an insane delusion. Motions for judgment n. o. v. and for a new trial were overruled and judgment entered on the verdict. Proponents thereupon took these appeals.

It is well settled that "A delusion which will render invalid a will executed as the direct result of it is an insane belief or a mere figment of the imagination—a belief in the existence of something which does not exist and which no rational person, in the absence of evidence, would believe to exist:" *Alexander's Estate,* 246 Pa. 58, 62. See also *McGovran's Estate,* 185 Pa. 203. The following statement pertaining to the law concerning such delusions was approved by this Court, in *Thomas* v. *Carter,* 170 Pa. 272, 282: "A man may be of sound mind

in regard to his dealings in general, but he may be under an insane delusion, and whenever it appears that the will was the direct offspring of the partial insanity or monomania under which the testator was laboring at the very time the will was made, that it was the moving cause of the disposition, and if it had not existed the will would have been different, it ought to be considered no will, although the general capacity of the testator may be unimpeached."

The burden of showing that decedent was suffering from an insane delusion and that such controlled his volition and destroyed his freedom of action in disposing of his estate was on contestant, and to meet it, he adduced the following testimony: G. Howard Leedom died on April 24, 1940, at the age of eighty-three, leaving a will dated September 8, 1938, and a codicil dated June 29, 1939. At the time of their execution he was over eighty years old and was afflicted with some of the mental and physical infirmities which frequently attend one at such an advanced age. His wife had managed all his business matters almost to the time of her death, which occurred May 23, 1939—less than two years before his own. He suffered for many years prior to his demise from a heart condition, bladder trouble, disease of the kidneys and weakness of the legs, and experienced much trouble in getting about due to his condition and to his great weight of about three hundred pounds. About seven months prior to the execution of the codicil he became bedridden—a helpless invalid—and death overcame him about sixteen months later. He and his wife had no children and had looked upon and acted toward their nephew, the contestant, as though he were their own son. This feeling of very close relationship and understanding began shortly after the death of the father of the nephew. At that time the latter was but ten years of age, and he subsequently spent much time during the formative period of his life with his uncle and aunt in their home. The mutual affection existing between them

continued uninterrupted for a period of nearly forty years, but immediately following the funeral of the wife of testator, for no sensible reason, his feeling toward his nephew suddenly underwent a violent change. When the nephew returned from the cemetery at that time, instead of finding the affection and friendliness which had always welcomed him, he was greeted with an accusation that he was endeavoring to put the testator in an institution, to have a guardian appointed for him and thus to gain control of his estate. The uncle was excited, vehement and bitter, expressing intense hatred toward him. He said: "you will never take me out of here alive"; · and he continued: "I have guns in this house, I am not afraid to use them"; "I will use them"; "I know what your scheme is"; "you and . . . [others] are scheming to put me in an institution, to have me declared incompetent"; and "you won't do it, I have a lawyer, you won't take me out of here alive." Words to the same effect were repeated time and again by testator in the remaining short period of his life. This unfounded belief remained with him until his death, and clearly manifested itself, to the nephew's detriment, in the will and codicil he executed. It was impossible to reason with testator; he would not listen. The will was executed less than four months after the death of his wife and the codicil about nine months later.

On the other hand, proponents agree that decedent believed that contestant was plotting against him, and "that his feeling toward the contestant resulted from that belief, as did the disposition of his estate under the Will and Codicil now in question." They contend, however, that judgment notwithstanding the verdict should have been entered in their favor because it appeared as part of contestant's own case, that there were grounds for this erroneous belief, and that it was, therefore, not the result of a delusion. They assert that testator's feeling had some basis, because contestant had admittedly suggested that his uncle come to live with him in New

Jersey and had spoken to two of his uncle's old friends, his physician and his attorney, about the advisability of his making such a change in his residence. There was also evidence of other acts on the part of contestant and his wife, but none of them indicated any such thought in their minds as testator attributed to them. We agree with the jury and the court below that the uncle's sudden and bitter accusation of his nephew (whom he had for so many years cherished with love and affection), charging that he plotted to have him confined in an institution in order to obtain control of his estate, could be the result of only an insane delusion. Clearly such thought on the part of the testator, without evidence that his nephew had any intention other than to arrange for the care of his aged and invalid uncle left alone after the death of his wife, was without any cause whatever in reason or in fact, and obviously rested wholly on things imagined.

The learned chancellor, in his opinion denying the motions for judgment n. o. v. and for new trial, said: "There was testimony presented to the jury which if by them believed (which the verdict indicated they did) would have established the presence of this delusion and its effect upon decedent's action at the time these testamentary papers were made. . . . As the chancellor I have no difficulty in sustaining the verdict. As a juror I would have rendered no other verdict." We are satisfied that the chancellor's conclusion was supported by the proofs presented, which showed that testator's belief concerning his nephew was the result of a perverted imagination, was without foundation in fact, and was such as no rational person would have entertained under the circumstances. The jury, therefore, was entirely justified in finding that testator was suffering from an insane delusion—a mere figment of his imagination—and that he was under its influence when the will and codicil in question were made.

A somewhat similar situation arose in *Power* v. *Overholt*, 257 Pa. 254. There the testatrix made her will

while laboring under an unfounded belief that one of her nieces, a natural object of her bounty, had stolen certain silver articles from her. In sustaining the action of the jury in finding the existence of a controlling insane delusion, the lower court said, and the judgment was affirmed by this Court on that opinion (p. 258) : "In the light of this testimony we cannot say that there was not sufficient evidence from which this jury could find that the mind of this testatrix was not controlled by an insane delusion to the detriment of the plaintiff.. That she believed that plaintiff had stolen from her is beyond question under the evidence. That no sane mind could entertain this belief in view of the circumstances is too clear for controversy. . . . That this delusion was a potent factor in her mind when she sought to dispose of her property by the paper in question would seem to be plain when it is remembered that after the document was executed and she had returned to West Chester, she repeated the charges to Mrs. Leedom, specifying the articles stolen—spoons and forks—and said 'that was all she (the plaintiff) would ever get.' She had then disposed of her estate in substantially this fashion so far as the plaintiff was concerned. It was clearly the province of the jury, under all the evidence, to determine whether there was, in fact, a delusion, and whether it was present in and operative upon the mind of the testatrix, when the will in controversy was made. There was sufficient evidence to sustain the verdict, and we must therefore dismiss the rule for judgment and the rule for a new trial."

This case was ably and carefully tried, it was submitted to the jury in a charge free from material error, the verdict is well supported by the evidence, and in this situation we can see no reason to interfere with the judgment entered thereon.

Decree affirmed.