### Dovci Will.

Argued October 9, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, WRIGHT and WOODSIDE, JJ.

*Russell S. Machmer,* for appellants.

*Robert McK. Glass,* with him *Samuel Gubin,* for appellee.

Opinion by Hirt, J., December 29, 1953:

In this will contest the lower court refused to grant an issue *devisavit vel non*. The question here is whether there is a substantial dispute as to decedent's testamentary capacity on June 2, 1950. In her will executed on that date she gave her home in Mount Carmel to her son Michael Dovci. She died on August 28, 1951, at age 73. The above real estate comprised the whole of her estate and the effect of the devise was to disinherit her two daughters, the appellants herein.

The granting of an issue *devisavit vel non* is not a matter of right; there must be a substantial dispute which can be determined only from a consideration of the evidence as a whole. And on appeal from the refusal of an issue, the chancellor's decision will not be reversed unless an abuse of discretion appears. *Franz Will*, 368 Pa. 618, 84 A. 2d 292; *Johnson Will*, 370 Pa. 125, 87 A. 2d 188. The test as to the propriety of granting an issue *devisavit vel non* is whether there is testimony sufficient both in quantity and quality to raise a substantial dispute of fact. *Zakatoff Will*, 367 Pa. 542, 81 A. 2d 430; *Sturgeon Will*, 357 Pa. 75, 53 A. 2d 139. But in determining whether an issue should be granted the hearing judge may not constitute himself the jury; if a substantial factual dispute exists, the issue must be granted even though the verdict may be at variance with the opinion of the judge. *Lare Will*, 352 Pa. 323, 42 A. 2d 801. "The rule is firmly established that the judge of the orphans' court conducting the hearing on an appeal for the granting of an issue d.v.n. is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate factfinding tribunal; his function is to determine whether there is a substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, *even if at*

*variance with his own opinion,* would not have to be set aside as judicially untenable because contrary to the weight of the evidence": *Lewis Will,* 364 Pa. 225, 232, 72 A. 2d 80; *O'Malley Will,* 370 Pa. 281, 88 A. 2d 69. In the present case we are convinced that the contestants have met the burden upon them. The testimony clearly raises a substantial dispute as to the testamentary capacity of decedent when the will under attack was executed. Accordingly there is error in the refusal of an issue *devisavit vel non.*

The two daughters of the testatrix are the appellants. The daughter Mary prior to her marriage lived with her widowed mother in the house owned by the mother in Mount Carmel. There then was a bond of affection between them. Mary married John Jefferson in 1937 and they then made their home with testatrix in the Mount Carmel home and except for a period of about three months continued to live there until the death of Mary Dovci on August 28, 1951. The relationship which was harmonious for several years showed signs of deterioration in 1940 or 1941. Testatrix had developed an antipathy for Mary's husband and in December 1941 accused him of attempting to injure her seriously. From that time until her death she imagined that Mary and her husband, particularly, were damaging her property and were bent on doing her bodily harm. In the fall of 1942 she accused them of trying to burn her house down. She imagined that others also were plotting against her. Over a period of two years she complained that her neighbors were stealing from her and were maliciously tearing shingles from the roof and damaging the foundation of her house. In 1944 she complained to Mary that her husband had set off a bomb in the front bedroom of the house where testatrix slept. From that time until her death bombs became an obsession and she frequently

accused the Jeffersons of setting them off in her house. She accused them also of stealing her furnishings and complained that they were cutting her carpets with razor blades. Beginning in 1944 she was convinced that Jefferson was shooting a gun in the house and accused him of trying to kill her. At other times she imagined that the Jeffersons were plotting to kidnap her. These were hallucinations, without the slightest foundation in fact, but they were real in the mind of testatrix. In 1947 she made an information before a justice of the peace charging the Jeffersons with imagined violence against her. No hearing on the charges was ever held. Beginning in 1949 testatrix accused them of trying to poison her; she then began preparing her own food and she refused to eat with them for about a year before her death. In February 1949 she suffered a stroke which, although not wholly incapacitating, caused sluggishness in the functioning of both her mind and body. In April 1951 she was rescued by the police from the porch roof of her house. She had crawled out onto the roof and had threatened to commit suicide by throwing herself to the ground. In lieu of rent the Jeffersons had shared with testatrix the cost of maintaining the household. Because of her fears of violence at their hands she a number of times had asked the Jeffersons to move out of her house. In 1949 she instructed her lawyer Joseph H. Deppen to start eviction proceedings because, according to his testimony, she told him that "They are bombing her all the time . . . they shoot at her . . . they put poison in her coffee . . . [and] around the inside of the room, where she sleeps." No proceeding was brought and the Jeffersons did not leave the house except on one occasion for a period of about three months. Mr. Deppen drew a will for this decedent in 1943 in which she divided her estate equally among her three children. In 1950

she asked him to draw a new will giving her entire estate to her son. He refused because he thought she then was not "in shape to make a will." The proponents and their witnesses do not suggest that the withdrawal of the Jeffersons from the household would have restored testatrix's equilibrium. On the contrary it in substance appears to be conceded that Mary was needed in the home to care for her mother. In June 1950 Carleton M. Strouss, Esq., who was then representing Mary Dovci, and who as scrivener later drew the questioned will, advised Mary to stay because her services were needed by her mother although he had been instructed by testatrix to notify the Jeffersons to move from the house.

There is corroboration of Mary and her husband, as to some of the hallucinations entertained by her mother, in the testimony of a neighbor and five other witnesses who were acquaintances or friends of long standing. Anna Schwink, testatrix's other daughter, an appellant herein, testified that her mother complained that Mary was poisoning her; was damaging her property and stealing her goods. Anna stated that during June 1950 the month in which the will was made, her mother's conversations were not rational.

Dr. Robert E. Allen was the family physician and he saw relatrix frequently between February 1940 and July 10, 1951. He gave a statement on March 6, 1950 to the scrivener who drew the will to this effect: "Today, I examined Mrs. Mary Dovci. I find her to be of sound mind—though sluggish in her thinking. I have examined her many times in the past and on every occasion found her sound in mind." He testified however that decedent did complain to him that her son-in-law was poisoning her. He checked for evidence of poisoning and finding none, concluded that her complaint was groundless. Decedent's main disability was

the result of hypertension. Her blood pressure at times was as high as 250/100 and Dr. Allen testified that a person with abnormally high blood pressure is subject to hallucinations or delusions with the possibility of mental derangement. He examined her on May 25, 1950, eight days before the will was executed; her blood pressure then was 200/100. On August 6, 1950 more than a month after the execution of the will her blood pressure was 210/100. He testified in substance that her blood pressure varied from day to day and the effect on her mind varied with it. His expressed opinion that she had testamentary capacity is weakened by the fact that he did not examine her on or about June 2, 1950 when she made her will. Moreover he was testifying to general competency, as was the scrivener who drew the will and the witnesses to its execution. This fact lessens the weight of his testimony that it otherwise would have. Cf. *Johnson Will,* supra.

We are not concerned with general incapacity but with the substantial dispute of fact as to whether the delusions to which we have referred improperly influenced the decedent's testamentary disposition of her estate to the disadvantage of her daughter Mary, and perhaps also to her daughter Anna, who should have been natural objects of her bounty. A will is invalid when executed as the direct result of " '. . . an insane belief or a mere figment of the imagination—a belief in the existence of something which does not exist and which no rational person, in the absence of evidence, would believe to exist' ": *Leedom Estate,* 347 Pa. 180, 32 A. 2d 3, quoting this also from *Thomas v. Carter,* 170 Pa. 272, 33 A. 81, with approval: " 'A man may be of sound mind in regard to his dealings in general, but he may be under an insane delusion, and whenever it appears that the will was the direct offspring of the partial insanity or monomania under which the testa-

tor was laboring at the very time the will was made, that it was the moving cause of the disposition, and if it had not existed the will would have been different, it ought to be considered no will, although the general capacity of the testator may be unimpeached.' " Cf. *Weiss Will*, 366 Pa. 456, 460, 77 A. 2d 422; *Johnson Will*, supra.

There is an abundance of evidence in this case which would support a finding of a jury that this testatrix was obsessed with fixed delusions, with no foundation in fact, and that the will was engendered and induced by these figments of her diseased imagination.

The order is reversed and an issue *devisavit vel non* is directed to be granted.