Sommerville Will.

Argued November 27, 1961. Before BELL, C. J., JONES, COHEN, EAGEN and ALPERN, JJ.

reargument refused February 12, 1962.

*Barbara Ann Duffy,* with her *G. Hayward Reid,* for appellant.

*Charles M. Solomon,* with him *Franklin A. Wurman, Bernard L. Frankel,* and *Fox, Rothschild, O'Brien & Frankel,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, January 17, 1962:

The question involved may be simply stated. Does a mother's hatred for her illegitimately born daughter for no disclosed reason amount in law to an insane delusion and justify the voiding of her will?

Margaret Sommerville, the testatrix, died August 28, 1958. She executed her will on October 22, 1945. It was prepared by a reputable attorney, Henry J. Rebman, and he and Mary J. Tait were subscribing witnesses. Unfortunately, both predeceased testatrix. Testatrix bequeathed and devised to her long-time friend, Martha Elizabeth Guy, her residuary estate which amounted to approximately $50,000, but left her daughter a legacy of only $2,000 and her daughter's son only $1,000.

The Orphans' Court entered a decree directing the following questions of fact to be tried by a jury:

"(1) Whether or not at the time of execution of said writing the Decedent was a person of sound and disposing mind;

"(2) Whether or not the said writing was procured by undue influence, duress or fraud practiced upon the said Decedent by Martha Elizabeth Guy, and others."

The jury answered the first question No. The jury did not answer the second question probably because there was not a scintilla of evidence that Mrs. Sommerville's will was procured by undue influence or duress or fraud practiced upon her by the legatee, Martha Elizabeth Guy, or by anyone. The Orphans' Court, with Judge BOLGER dissenting, entered a decree which affirmed the finding of the jury and set aside the probate of Mrs. Sommerville's will,—not on the ground of general testamentary incapacity but on the ground of an insane delusion against her daughter. Martha Elizabeth Guy took this appeal.

## The Evidence

We shall briefly summarize the voluminous testimony.

Margaret Sommerville was born circa 1866. She came as a young girl to this Country from Scotland. In 1890 she gave birth, out of wedlock, to the contestant, but two years later married the father of the child, now called Margaret Russell. Sommerville left his wife a few months after their marriage and never contributed any support to his wife or child. Contestant never saw her father.

Contestant was placed in the Philadelphia Orphans Asylum at an unknown time, but before she was six years of age. She remained in the Orphanage until she was over 17, at which time she was bound out to a family as a child's nurse for fifty cents a week until she reached the age of 18, when she received a lump sum payment of $50. *Testatrix's only employment during her entire life was as a live-in laundress,* and it was conceded that she was an illiterate person with very little if any schooling. No reason is disclosed why contestant was placed in the Orphan Asylum, but it is obvious it must have been because her mother didn't have a home or the money to support her.

From the time contestant was placed in the Orphanage until 1908, when she was nearly 18 years old, she saw her mother about 8 times. A few weeks before she was 18, *her mother asked her to pack her clothes and come home and live with her;* she refused, and never told her mother the reason for her refusal. However, she testified that it was because "the people of the home. .... decided then, as my mother did not have a home to care for me, that I would continue on the job until they could verify that my mother had a home for me." It is clear that her mother was very upset and rankled by this refusal.

Contestant didn't see her mother again until 1922* and during that long interval from 1908 until 1922, her mother made no attempt to see her, although contestant testified that she wrote her mother several letters, all of which came back.

Her mother came to see her in 1922.** From 1922 to 1928 contestant visited her mother 6 or 7 times and they corresponded irregularly with each other. During this period and after contestant had refused to go and live with her mother, her mother did not wish to see contestant and wrote how much the contestant upset her and how much she despised and hated her. Nevertheless, contestant succeeded in borrowing money from her mother, the amount and date of which are unknown. Moreover, contestant in some way obtained possession of the deed to her mother's cemetery lot and despite several requests from her mother, refused to re-

---

\* When contestant was 32 years of age.

\*\* Contestant testified that she and her husband loaned her mother $2,000. She later admitted that this was untrue. Contestant's husband, from whom she was then separated, loaned her mother $2,000, which was repaid. This episode is mentioned because the lower Court erroneously recollected the testimony and in its opinion placed much reliance on this alleged loan by the contestant to her mother.

turn it. There is no doubt of the fact that testatrix did not get along with her daughter and despised and hated her. None of this is a figment of the imagination, all of the foregoing are admitted or clearly established facts.

. . Testatrix, although only a laundress, saved enough money to purchase 9 properties prior to 1928. In 1928 she took these properties out of the hands of her real estate agent because she did not think she was getting a sufficient return. Thereupon, contestant filed a petition in the Court of Common Pleas to have her mother declared incompetent. A hearing was fixed for December 1, 1928, but no hearing was held. At that time contestant had obtained an eminent psychiatrist, Dr. Leopold, to testify in support of the petition that her mother was incompetent and was likely to become the victim of designing persons and was incapable of managing her estate. Contestant testified that when the Judge came out of his chambers after a conference with the attorneys he said that her mother's property should be taken care of by the Land Title Trust and Mortgage Company, and the case was withdrawn. The property was never taken out of her mother's hands or placed with the Land Title. Testatrix wrote a letter to Dr. and Mrs. Tait (Dr. Tait was her cousin), explaining why she changed her mind about appointing the Land Title as her real estate agent. In this letter she said, inter alia, that if she had been left alone by her daughter she would soon have had saved an additional $1,000 to buy a new home in a better part of the City, and that her daughter had tried to have her "made simple-minded" when in less than 5 years she had paid off mortgages on her properties totaling $6,800, and during this time had also spent over $3,000 in repairs, and "My daughter knew what wages I got and was always after the money, and now they try to tell me I can't have brains enough to look after my own properties." Except for

the contestant's motives—as to which testatrix may or may not have been mistaken—these are not figments of imagination, these are actual facts!

It is indisputable that contestant gave her mother no affection or love or comfort or care; that she refused to come and live with her; that she rarely ever saw her; that she tried to have her declared incompetent; that they never got along well together; and that her mother despised and hated her—for no disclosed reason, although it is clear that there were ample reasons to justify in her mind her feelings toward her daughter. Under these circumstances why should the law compel her to leave her estate to her daughter instead of to a woman who had befriended her for years?

Dr. Leopold testified at the trial of this case in 1960—based upon the notes he had made in 1928—that testatrix was incompetent in 1928 and unable to manage her own affairs and that *at that time* "she was not delusional—I couldn't call her delusional when I saw her . . . a fixed idea against her daughter which could become a chronic delusional process . . . . She had a delusional trend, not very strong, but present . . . . This delusional trend [was] very pronounced and chronic." Just what that contradictory testimony meant was clear to the lower Court but not to us—certainly it was insufficient to prove, contrary to the lower Court's conclusion, an insane delusion as that term is known to the law. It is both interesting and important to note in connection with the weight to be given to Dr. Leopold's testimony—upon which the lower Court so strongly relied—(a) the remoteness of the time between 1928 and 1945 when testatrix executed her will, and (b) that from 1928 to 1945 Margaret Sommerville, who was only a laundress, increased her real estate holdings from 9 properties to 14 properties and continued to manage all of them until 1950, when she appointed Robert F. Lehman, Esq., attorney-in-fact,

and (c) that Margaret Sommerville executed her will on October 22, 1945, which was prepared by Henry J. Rebman, a reputable member of the bar, and witnessed by Rebman and Mary J. Tait, and (d) Robert F. Lehman, another reputable member of the bar,[*] testified that Margaret Sommerville in April, 1946, was an able, intelligent woman with a keen intellect and sound mind and that at that time was fully conversant with the extent of her property and the members of her family and the extent of her will, and (e) that she (a laundress) accumulated by her business ability so much money that after paying for all her expenses at nursing homes and hospital and doctors' bills for the years 1950 until her death in 1958, she left an estate of approximately $50,000.

These facts aptly illustrate the wisdom of the well established rule that the opinion testimony of medical experts is of very little weight or value when opposed to factual evidence: *Williams v. McCarroll*, 374 Pa. 281, 97 A. 2d 14; *Conway Will*, 366 Pa. 641, 79 A. 2d 208; *De Maio Will*, 363 Pa. 559, 70 A. 2d 339; *Sturgeon Will*, 357 Pa. 75, 53 A. 2d 139; *Cookson's Estate*, 325 Pa. 81, 188 A. 904; *Phillips's Estate*, 299 Pa. 415, 149 A. 719; *Commonwealth v. Gossard*, 385 Pa. 312, 321, 123 A. 2d 258; *Commonwealth v. Patskin*, 375 Pa. 368, 375, 100 A. 2d 472; *Commonwealth v. Heller*, 369 Pa. 457, 461, 87 A. 2d 287; *Dawson v. Pittsburgh*, 159 Pa. 317, 325, 28 A. 171.

In 1950, testatrix was taken to Hahnemann Hospital suffering from severe malnutrition and at that time Dr. McFarland testified that she was senile, but he was unable to testify how long the condition of senility had existed. Mrs. Sommerville was then in her 80's, so the fact that she was senile in 1950 and thereafter and ar-

---

[*] From 1950 until the time of her death in 1958, testatrix was confined in hospitals and nursing homes and Mr. Lehman took care of her affairs.

guendo unable to manage her affairs in 1928 has, at best, very, very little, if any, weight as to whether she had testamentary capacity and was under an insane delusion in 1945 when she executed her will.

It has always been the law of Pennsylvania that a parent does not have to leave any of his property to any of his children, irrespective of whether he likes them or dislikes them, or hates them, and he does not have to disclose his reasons for disinheriting them. Cases, infra. Contestant admits, as she must, that if a parent has no feeling or love for a child he can disinherit her, or if he dislikes a child he can disinherit her, but argues that if he hates a child without disclosing any reason for his hatred, he cannot disinherit her. It may or may not be humane and wise for the legislature to change the law which has existed for several centuries and require a parent to bequeath a substantial portion of his estate to his legitimate and illegitimate child or children, irrespective of his feelings for them or how they have treated him, but until such a change is made by the legislature the contention of the contestant has, as we shall see, no basis in logic, or in law.

### Insane Delusion

What is an insane delusion as that term is known to the law? All of the cases of this Court have agreed for over 100 years that an insane delusion is "a mere figment of the imagination, a belief in the existence of something which does not exist, and which no rational person . . . would believe did exist." *Duross Will*, 395 Pa. 492, 150 A. 2d 710; *Johnson Will*, 370 Pa. 125, 87 A. 2d 188; *Weiss Will*, 366 Pa. 456, 77 A. 2d 422; *Leedom Estate*, 347 Pa. 180, 32 A. 2d 3; *Doster's Estate*, 271 Pa. 68, 113 A. 831; *Power v. Overholt*, 257 Pa. 254, 101 A. 733; *Herr's Estate*, 251 Pa. 223, 96 A. 464; *Alex-*

*ander's Estate,* 246 Pa. 58, 91 A. 1042; *Bennett's Estate,* 201 Pa. 485, 51 A. 336; *Hemingway's Estate,* 195 Pa. 291, 45 A. 726; *McGovran's Estate,* 185 Pa. 203, 39 A. 816; *Thomas v. Carter,* 170 Pa. 272, 33 A. 81; *Taylor v. Trich,* 165 Pa. 586, 30 A. 1053; *Shaver v. McCarthy,* 110 Pa. 339, 5 A. 614; *Tawney v. Long,* 76 Pa. 106; *Bitner v. Bitner,* 65 Pa. 347; *Boyd v. Eby,* 8 Watts 66; see also *Dovci Will,* 174 Pa. Superior Ct. 266, 101 A. 2d 449; *Boughton v. Knight,* L. R. 3 Prob. & Divorce, 64.

In *Duross Will,* supra, we reviewed and reaffirmed the long established principles and the well settled law which directly rule the instant case and sustain the will. In that case, decedent left her residuary estate consisting of $15,000 to her closest friend, to whom she also gave her life insurance policy of $5,000. One of her sisters contested the will contending that testatrix was suffering from an insane delusion which directly controlled her will and caused it to be different than if the delusion had not existed. Testatrix loved and often visited her sisters and brothers and their respective children, whom she disinherited. Testatrix was in charge of the occupational therapy department of a state owned hospital for the insane. Witnesses who knew decedent, including a psychiatrist—to whom she went to be psychoanalyzed—testified (a) concerning the strange beliefs and delusions that testatrix possessed and (b) that she was suffering under a form of manic depressive psychosis and (c) that she was subject to a delusion at the time of the execution of her will which controlled the disposition of her estate, and (d) that if she had not suffered from such mental illness, psychoses and delusions she would not have written such a will as she actually did. A jury returned a verdict finding that decedent lacked testamentary capacity and that her will was the result of an insane delusion. In spite of all this evidence this

Court unanimously affirmed a judgment n.o.v. The Court pertinently said:

"Appellant approaches this case under the mistaken belief, which is shared by many laymen and by some members of the medical profession, that disinheriting a child or relative invalidates a will and discloses a lack of testamentary capacity, or undue influence, or insanity or an insane delusion. Of course that is not the law.

"Testamentary capacity is presumed and the burden of proving lack of testamentary capacity or an insane delusion is upon those who assert it: Lauer Will, 351 Pa. 438, 41 A. 2d 552; Sturgeon Will, 357 Pa. 75, 53 A. 2d 139; O'Malley Will, 370 Pa. 281, 88 A. 2d 69; Kerr v. O'Donovan, 389 Pa. 614, 134 A. 2d 213; Williams v. McCarroll, 374 Pa. 281, 97 A. 2d 14.

"In Johnson Will, 370 Pa. 125, 87 A. 2d 188, Johnson, an illiterate colored man 84 years of age, the father of ten children, left by will two houses and their furniture [not to his children but] to an acquaintance who was a white woman. Johnson was suffering from senile dementia, from occasional loss of memory, and from a mental disturbance pertaining to sex. This Court sustained the refusal of an issue devisavit vel non and said . . . : '. . . it is and always has been the law of Pennsylvania that every individual may leave his property by will to any person, or to any charity, or for any lawful purpose he desires, unless he lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion. While it is difficult for many people to understand how or why a man is permitted to make a strange or unusual or an eccentric bequest, especially if he has children or close relatives living, we must remember that under the law of Pennsylvania " 'a man's prejudices are a part of his liberty.

He has a right to the control of his property while living and may bestow it as he sees fit' at his death: McCown v. Fraser, 327 Pa. 561, 192 A. 674; Cauffman v. Long, 82 Pa. 72." . . .' See to the same effect: Borsch Estate, 362 Pa. 581, 67 A. 2d 119; Guarantee Trust & Safe Deposit Co. v. Heidenreich, 290 Pa. 249, 257, 138 A. 764; Higbee Will, 365 Pa. 381, 384, 75 A. 2d 599.

". . . ' ". . . a decedent possesses testamentary capacity '. . . if he has an intelligent knowledge regarding those who are the natural objects of his bounty, of what his estate consists, and of what he desires done with it, even though his memory has been impaired by age or disease' ": Franz Will, 368 Pa. 618, 622, 84 A. 2d 292; also Sturgeon Will, 357 Pa. 75, 53 A. 2d 139; Ash Will, 351 Pa. 317, 41 A. 2d 620; Olshefski's Estate, 337 Pa. 420, 11 A. 2d 487.'

". . . What is an insane delusion and when is it sufficient to invalidate a particular will?

"The law is well settled that a person may be of sound mind in regard to her general affairs and have testamentary capacity, yet at the same time may be under an insane delusion. It is difficult to formulate a definition of an insane delusion which will cover every possible case, but the general rule is clear that it must be, as its name implies, an insane delusion, and that it must have caused decedent to make his will in a manner entirely different from what he would have if the insane delusion did not exist.

"In Johnson Will, 370 Pa., supra, the Court, quoting from Leedom Estate, 347 Pa. 180, 32 A. 2d 3, said (page 129) : ' "It is well settled that 'A delusion which will render invalid a will executed as the direct result of it is *an insane belief or a mere figment of the imagination—a belief in the existence of something which does not exist** and which no rational person, in the

---

* Italics throughout, ours.

absence of evidence, would believe to exist:' Alexander's Estate, 246 Pa. 58, 62 . . . ." ' "

*Duross Will* did not enunciate a new principle of law, it reiterated and reaffirmed what has been the well settled law of Pennsylvania for a century. Cases supra. Each and every one of these cases specifically define an insane delusion to be "A delusion which will render invalid a will executed as the direct result of it *is an insane belief or a mere figment of imagination— a belief in the existence of something which does not exist and which no rational person . . . would believe did exist.*"

In *McGovran's Estate,* 185 Pa., supra, the Court affirmed the refusal of an issue d.v.n., based upon an alleged insane delusion which caused a testatrix to disinherit one of her daughters, and pertinently said:

"It may be conceded that the testimony shows clearly enough for present purposes that the feelings of the testatrix towards Mrs. Murdoch, the appellant, underwent a marked change shortly prior to the making of the will; that, whereas, she had entertained for her feelings, which if not shown to be affectionate, were at least trustful and kind, she came to fear and dislike her; and so radical and decided was the change that testatrix attributed at least every attention she received from appellant to mercenary motives, and believed not only that she was scheming through such acts to get a portion of her estate, but experienced the fear that she might take her life the sooner to enjoy it, and for this reason she was unwilling to have her in the house. It may be further conceded that appellant was discriminated against in the will solely because of the change of feeling, and that there is nothing in the evidence that explains or accounts for it.

". . . Alienation and estrangement, attended by most radical change of feeling, . . . are quite too common and frequent to be referred to as either unnatural or

as indicating a disturbed mental condition; the distrust and fear may be exceptions in their degree, but no different inference results. . . . The burden still rested upon her, as part of her case, to show . . . that *the change resulted from a delusion, that is to say, that it was without any cause whatever in reason or in fact, but rested wholly on things imagined. For a delusion is a creation of the imagination."*

*Doster's Estate,* 271 Pa., supra, was another hard case where this Court affirmed the refusal to grant on behalf of a disinherited daughter an issue on the question of an alleged insane delusion. The daughter had criticized her father for marrying her school chum very many years his junior, and had criticized her brother for marrying his father's second wife, and on one occasion had joined her mother who had divorced her father. The Court, after correctly defining an insane delusion, pertinently said: ". . . The reason for the rule there stated is well founded. To modify it would, through grievances, fanciful or real, cause fifty per cent of the wills written to be made the subject of judicial contest, and ofttimes the fruitful subject of perjured testimony. There is scarcely a will that satisfies everybody."

In *Herr's Estate,* 251 Pa., supra, the Court said (pages 227-228): "It is also contended by appellant that the will was induced by hallucinations or delusions under which testatrix had been laboring for years, to the effect that her friends and relatives, with particular reference to the contestant, her nearest relative, were endeavoring to rob her of her property, and had employed attorneys for that purpose. *An examination of the evidence shows there were natural causes for this feeling toward contestant.* Testatrix had not been on good terms with contestant for a long period of years, possibly from childhood, but certainly from a time when there was a dispute concerning the settle-

ment of the estate of their mother, at which time contestant presented a claim against the estate for services for nursing her mother in her last illness. Since that time the relations between contestant and testatrix were most unfriendly, and this state of affairs continued up to the time of the death of testatrix.

"A delusion which will render invalid a will executed as the direct result of it, is *an insane belief or a mere figment of imagination, a belief in the existence of something which does not exist, and which no rational person would believe did exist*: Taylor v. Trich, 165 Pa. 586; Alexander's Est., 246 Pa. 58. The moment it is discovered, however, that what at first sight was apparently a delusion is in fact based upon some substantial ground, reasonably calculated to produce the belief held by testatrix, *the theory of the insane delusion necessarily disappears.* One who is of sound and disposing mind is entitled to distribute his property as he may see fit, without regard to the personal motives or prejudices which influenced him: Dean v. Negley, 41 Pa. 312; Phillips' Est., 244 Pa. 35. His prejudices, likes or dislikes are his own as much as the property which he distributes, and the fact that his method of distribution may offend our sense of propriety and justice is no reason to set aside the will: Cauffman v. Long, 82 Pa. 72; Phillips' Est., 244 Pa. 35-37."

While this testatrix was under no delusion of any kind whatsoever, it is not enough that the testatrix should have a delusion—it must be an insane delusion. This distinction has been clearly drawn ever since 1902 when this Court in *Bennett's Estate*, 201 Pa., supra, said (page 490) : "But all delusions are not insane delusions. A man may, from information given him, believe that his son is dead, when, in point of fact, the son is alive. The father's belief is a *delusion;* and if, when his son appears to him in person and explains that the information was false, the father persists in

thinking him dead, his belief becomes an *insane delusion.* The difference between the two species is that one is the product of the reason, and the other a figment of the imagination."

In the present case, the testatrix's attitude toward her daughter was not even based upon a delusion, much less upon an insane delusion. At most it was a prejudice—to many, an unreasonable prejudice—but this does not meet the legal test, nor do the facts bring it within any prior decision which recognized the presence of an insane delusion.

Forgetful of the many babies who have been placed in Orphan Asylums (or abandoned) by their mother because she has no money or home for them, or out of a sense of shame, and forgetful of the many children who have been legally (but in the minds of many, unjustly) disinherited by their parent, the contestant seeks to bridge this legal abyss by a psychiatric discovery that testatrix had a psychosis, a "guilt psychosis" which she transferred to her daughter and *this undisclosed reason was an insane delusion* which caused her to disinherit her daughter. Such a delusion may satisfy psychiatry but not the law. See cases, supra.

By no stretch of the imagination can hatred for an illegitimate child, even if it be conceded arguendo that it existed—a hatred which was not created by a figment of the imagination but out of a sense of shame or guilt—amount to an insane delusion within the definition and meaning of the aforesaid cases. We repeat: An insane delusion is as above shown clearly defined and circumscribed—a mere figment of the imagination, a belief in the existence of something which does not exist and which no rational person (in the absence of evidence) would believe to exist.

Two psychiatrists, one of whom saw her in 1928 and the other never saw her, were of the opinion that, contrary to all the records and all the factual evidence,

testatrix lacked testamentary capacity in 1945 when she executed the will, and further were of the opinion that testatrix had an insane delusion about her daughter which resulted from a guilt complex which they opined testatrix possessed and had unconsciously transferred to her daughter. Assuming, arguendo, that testatrix had this guilt complex and that it was the reason for her hatred of her daughter—although the evidence disclosed many substantial grounds as distinguished from this ground which was "imagined" by the psychiatrists—this would not amount in law to an insane delusion, nor be sufficient legally to void testatrix's will. Testatrix believed that her daughter was at birth an illegitimate daughter. That was not a figment or creation of testatrix's imagination; that was an actuality, a real indisputable actual truth. Testatrix did not believe in something which did not exist, it did exist—her daughter was born illegitimately— and deplorable as this hatred seems to all of us, it was not based on a figment of her imagination and therefore she had a legal right to hate her daughter and to disinherit her. Furthermore, contestant's refusal to live with her mother, her refusal to give her mother her deed to the cemetery lot, her suit to have her mother declared incompetent were not figments of testatrix's imagination.

All the feelings which have hitherto been well known to every American and which have hitherto been legally *in*sufficient to void a will, such as love for one particular member of one's family, or for a stranger, or an improper love for a member of the same sex, or an interest in a church or in a charity or in a hobby or in dogs or in people in a foreign land, or feelings of hatred or jealousy or dislike, have been possessed for centuries and have never heretofore fallen within the definition or meaning of "insane delusion." Our Courts have always held that a man's feelings, his likings, loves, prej-

udices and hatreds are a part of his liberty and (subject to a number of important but presently irrelevant exceptions) that he can use his property in his lifetime and bequeath it at his death in accordance with his wishes, whims or prejudices: *Little Estate,* 403 Pa. 534, 170 A. 2d 106; *Johnson Will,* 370 Pa. 125, 87 A. 2d 188; *McCown v. Fraser,* 327 Pa. 561, 192 A. 674; *Cauffman v. Long,* 82 Pa. 72.

We are now asked to change all of our well and wisely settled principles of law, overrule all of our prior decisions, and submit every man's will and the disposition of every man's property to psychiatrists and juries for them—of course with the aid of the Courts—to validate or invalidate. The basis or result of claimant's contention is that if a parent hated her daughter, the more the daughter is hated the more the daughter is entitled to inherit her mother's estate. This is being justified under the psychiatric terminology of "psychosis." Feelings such as fear, hatred, jealousy, agnosticism, improper love, and many others which have hitherto been considered ordinary or unusual or abnormal or eccentric and from the viewpoint of most people regrettable, but nevertheless an essential fundamental part of one's liberty, are now psychiatrically denominated as "psychoses"; and each of these is sufficient to void a gift or a will which a disappointed wife or child or relative or friend or employee wishes to void. To state this new doctrine is shocking to one who believes in the constitutionally ordained right of property and in the preservation of long established and well and wisely settled principles of law.

As this Court speaking through Justice (later Chief Justice) PAXSON aptly said in *Cauffman v. Long,* 82 Pa., supra (pages 77-78): "The growing disposition of courts and juries to set aside last wills and testaments, and to substitute in lieu thereof their own notions as to what a testator should do with his property, is not

to be encouraged. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of it. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances testamentary dispositions of property seem harsh, if not unjust, the result, perhaps, of prejudice as to some of the testator's kindred, or undue partiality as to others. But these are matters about which we have no concern. The law wisely secures equality of distribution where a man dies intestate. But the very object of a will is to produce inequality, and to provide for the wants of the testator's family; to protect those who are helpless; to reward those who have been affectionate, and to punish those who have been disobedient. It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of our human nature. It must be remembered that in this country a man's prejudices are a part of his liberty. He has a right to them; he may be unjust to his children or relatives; he is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law."

Why have our Courts established and maintained and iterated and reiterated the above mentioned principles of law which define and sustain a man's right to dispose of his property? What are the basic reasons for the law which has existed for centuries in England, and in Pennsylvania ever since we became a Commonwealth?

The hallmark of western civilization is freedom of speech and the right to own property. These ancient basic rights have been supplemented by two vitally important rights—freedom of religion and freedom of the

press. The first section, the very first section of Article I of the Constitution of Pennsylvania provides: "All men are born equally free and independent, and have certain inherent and *indefeasible rights,* among which are those . . . of *acquiring, possessing and protecting property* . . . ." The right of private ownership of property includes as its most essential ingredients (a) the right of every man and woman to use, and (b) the right of every sane man and woman to give away, in life and at death, their property. Were it otherwise, the "inherent and indefeasible rights, . . . of acquiring, possessing and protecting property" would be a vain and, realistically speaking, a useless right, even though it was a Constitutionally guaranteed right.

How have the Courts protected this ancient and constitutionally ordained right? The right of an owner of property to own, possess, protect and dispose of (his) property is absolute with four limitations: First: An owner of property cannot use his property in such a way as to injure another. Second: An owner cannot deprive his wife of her dower or statutory rights therein; and Third: The more recent limitation that a man's property is subject to the powers, rights and restrictions which may be validly and Constitutionally imposed by Government in the public interest and welfare. Fourth: An owner of property can bequeath his property as he wishes unless he lacks testamentary capacity or has a controlling and pertinent insane delusion, or the will was obtained by fraud or undue influence. A testator with children can disinherit some or all of his children for any reason whatsoever; he can give in his lifetime and also by will all his property to the poor or to any charity he may desire, or he can give it to a friend, or he can prefer one child over all the others, or he can give all his property to an agnostic society, or to an atheistic society, or to a hospital or a charity or to a religious organization, or to a

Foundation, or to the Commonwealth, or to a home for homeless cats, or to a group or organization living or working in other continents: *Heaton Estate,* 404 Pa. 360, 172 A. 2d 293; *Little Estate,* 403 Pa., supra; *Girard Will,* 386 Pa. 548, 127 A. 2d 287; *Cannistra Estate,* 384 Pa. 605, 121 A. 2d 157; *Johnson Will,* 370 Pa., supra; *Higbee Will,* 365 Pa. 381, 75 A. 2d 599; *Edge's Estate,* 339 Pa. 67, 14 A. 2d 293; *Nola's Estate,* 333 Pa. 106, 3 A. 2d 326; *Morgan's Estate,* 219 Pa. 355, 68 A. 953; *Cauffman v. Long,* 82 Pa., supra. In other words, a testator does not have to give his property to those he loves or to the relative society believes he should love, and he can give it in such a way that 99 percent of his fellow citizens believe is foolish or unjust or outrageous. That is one of the fundamental, basic, inherent rights of every citizen of the Commonwealth of Pennsylvania and these inherent basic rights have been established and reiterated and affirmed and reaffirmed by this Court times without number.

Shall we maintain the law as it has been clearly defined and established by many prior decisions of this Court for one hundred years, or shall we ignore these decisions, make a mockery of the Constitution and leave every man's will to psychiatrists and juries? In other words, are Courts going to permit a will made by a person who possesses testamentary capacity to be set aside and invalidated because (1) we believe it is unfair or very foolish, and (2) a psychiatrist testifies that the testator had a guilt psychosis or a sex psychosis or a hate psychosis or an improper love psychosis or a racial or a religious psychosis or a social psychosis, or any similar psychoses. Such psychoses may satisfy psychiatry but we repeat they do not satisfy the law or justify our changing it.

The doctrine of insane delusion is at best a dangerous one and should not be extended beyond its present limitations and clearly defined boundaries. The Courts,

recognizing this danger, have strictly limited, circumscribed and restricted the doctrine and in over 100 years have applied it less than 6 times. The reasons for its restriction are abundantly clear from the authorities hereinabove quoted and cited. The following cases well illustrate how narrowly the aforesaid doctrine has been restricted.

In *Weiss Will*, 366 Pa., supra, the will was set aside because it "was drafted and executed while the decedent was in a hospital during her last illness, she disinherited the daughter because of an antipathy toward her and her husband *for reasons expressed to the scrivener*. The complaints then voiced by the decedent *could only have been figments of her imagination* during her suffering from an operated malignancy for which she had received sedation regularly for months past. There is no need to recite the testimony in detail . . . the things which the mother related to the scrivener concerning her daughter and husband *had no basis in fact whatsoever.*"

In *Dovci Will*, 174 Pa. Superior Ct., supra, an issue d.v.n. was granted because the evidence overwhelmingly showed that testatrix suddenly developed an antipathy toward one of her children and her son-in-law, and within a two-year period frequently imagined that her daughter and her son-in-law were trying to do her bodily harm. *She accused them of trying to burn her house down, she imagined that they and others were plotting to kill her and had set off a bomb in her bedroom*, and that there was a plot to shoot her, to kidnap her, and to put poison in her coffee.

In *Taylor v. Trich*, 165 Pa., supra, the Court recognized the rule that "a delusion is a creation purely of imagination such as no sane man could believe, a belief in the existence of something that does not exist," where it appeared that the will was induced by testator's belief that his will was made by imaginary direc-

tions from God and from spirits, speaking to him from another world. This Court awarded a new trial because this question had not been properly presented to the jury.

In *Power v. Overholt*, 257 Pa., supra, this Court sustained the finding of a jury that the will was made as a result of a controlling insane delusion, since it was made while laboring under a false and completely unfounded belief that her niece, who was the natural object of her bounty, had stolen silver articles from her.

The strongest case in favor of an insane delusion is *Leedom Estate*, 347 Pa., supra, where the testator suddenly and bitterly accused his nephew, whom he had cherished with love and affection for many years and had brought up as a son, of plotting to have him confined to an institution in order to obtain control of his estate, and the Court said that this belief and accusation were so false that it could only have been the result of an insane delusion.

It is clear that the evidence in the instant case is not sufficient to prove an "insane delusion"* as that legal term has been defined and applied by a myriad of decisions of this Court and therefore a decree must be entered non obstante veredicto.

Decree reversed and record remanded to the Orphans' Court with directions to enter an appropriate decree sustaining the validity of the will of Margaret Sommerville. Each party to pay own costs.

Mr. Justice COHEN dissents.

---

* It must be further proved that the "insane delusion", if one existed, must have controlled the making of the will: *Duross Will*, supra.